# IN THE SUPREME COURT OF TENNESSEE
## AT JACKSON
Heard in Nashville
June 2, 2004 Session

## STATE OF TENNESSEE v. GREGORY ROBINSON

**Appeal by Permission from the Court of Criminal Appeals**
**Criminal Court for Shelby County**
**No. 97-13179-80     James C. Beasley, Jr., Judge**

---

**No. W2001-01299-SC-R11-DD - Filed September 28, 2004**

---

We granted the State's application for permission to appeal to determine whether the Court of Criminal Appeals erred by reversing the defendant's conviction for premeditated first degree murder and his sentence of death.  Upon review, we hold that the Court of Criminal Appeals erred in reversing the defendant's conviction and sentence.  In particular, we conclude that the trial court did not err by failing to instruct the jury on facilitation and solicitation or by permitting the medical examiner to display the victim's cleaned and reconstructed skull as a demonstrative aid during his testimony; that the prosecution did not present inconsistent theories and evidence in the separate trials of the defendant and co-defendant Prentiss Phillips; and that the sentence of death is not disproportionate considering the circumstances of the crime and the defendant.  Having reinstated the defendant's conviction and sentence, we have also reviewed and considered all other errors alleged by the defendant and conclude that none warrants relief.  With respect to issues not herein specifically addressed, we affirm the decision of the Court of Criminal Appeals.  Relevant portions of that opinion are published hereafter as an appendix.  Accordingly, the judgment of the Court of Criminal Appeals is reversed in part, affirmed in part, and the judgment of the trial court is reinstated.

**Tenn. R. App. P. 11; Judgment of the Court of Criminal Appeals Reversed in Part and Affirmed in Part; Judgment of the Trial Court Reinstated**

FRANK F. DROWOTA, III, C.J., delivered the opinion of the court, in which E. RILEY ANDERSON, JANICE M. HOLDER, and WILLIAM M. BARKER, JJ., joined.  ADOLPHO A. BIRCH, JR., filed a concurring-dissenting opinion.

Paul G. Summers, Attorney General and Reporter; Michael E. Moore, Solicitor General; Joseph F. Whalen, Associate Solicitor General; William L. Gibbons, District Attorney General; and Patience R. Branham and Paula Wulff, Assistant District Attorneys General, for the appellant/appellee, State of Tennessee.

Joseph S. Ozment and Steffen G. Schreiner, Memphis, Tennessee (at trial); and Edmund L. Carey, Jr., Nashville, Tennessee, and Robert C. Brooks, Memphis, Tennessee (on appeal), for the appellee/appellant, Gregory Robinson.


**OPINION**


### I. Factual Background

The defendant, Gregory Robinson, was convicted by a Shelby County jury of the premeditated first degree murder and especially aggravated kidnapping of Vernon Green. Proof presented at trial established that on the afternoon of April 30, 1997, a squabble between two small children in the Hurt Village Apartments in North Memphis led to an argument between the mothers of these children, which escalated into a fight, including gunfire, between the women's boyfriends, members of rival Memphis gangs – the Gangster Disciples and the Vice Lords.[1] As a result of this fight, the Hurt Village Gangster Disciples called an "aid and assist" meeting, and Memphis-area Gangster Disciples congregated at an apartment in the Hurt Village complex for this meeting. Although the victim was not a gang member and had not been involved in the earlier fight, he was seen near the apartment where the aid and assist meeting was being held. When a gang member accused Green of acting as a lookout for the Vice Lords, the defendant instructed other gang members to "snatch him up" and bring him to the apartment. For one and one-half to two and one-half hours, the defendant, along with other gang members, beat and interrogated Green. Eventually Green was taken from the apartment by six gang members and shot to death in Jessie Turner Park.[2] Green's body was discovered in the park between 5 and 5:30 a.m., on May 1, 1997, by members of a local walking club, who called the police. When Officer Alvin Peppers arrived at the scene, he found the victim's body lying face down in a prone position. Officer Peppers explained that he could not identify the victim's features, such as eye color, because the "face of the body was so mutilated that there was nothing that we could identify." Officer Peppers found no identifying objects on the body, such as a wallet or jewelry, but he recovered a numbered dry cleaner's tag from inside the victim's clothing that apparently was helpful in identifying the victim. Two live .45 caliber bullets, two .45 caliber bullet casings, and one .20 gauge shotgun shell casing were found within a five foot radius of the victim's body. The following complicated and detailed recitation of the testimony at trial is necessary to a full and proper consideration of the issues presented in this appeal.

Several former gang members testified about the events surrounding Green's kidnapping and murder. Two of these testified for the prosecution. The first, Christopher James, known as "Big Chris," testified for the prosecution. James had been a Gangster Disciple for three or four months on April 30, 1997. Around 5 or 6 p.m. on April 30, 1997, James and fellow Gangster Disciples, Jarvis Shipp, known as "J-Roc," and two other gang members called "Popcorn," and "Steve," witnessed a fight between Shipp's girlfriend and the girlfriend of "Snoop," a Vice Lords gang

---

[1]Witnesses at trial also referred to this gang as the Traveling Vice Lords.

[2] The park previously had been known as Bellevue Park.

-2-

member. Later, as James, Shipp, and Popcorn were walking toward the apartment of Shipp's girlfriend, Snoop approached them and begin swinging at Shipp. After Shipp and Snoop began fighting, another Vice Lord drew a gun. At this point, James and Popcorn fled, but a bullet grazed Popcorn's hand as they were running from the scene. They arrived from the fight at the Hurt Village apartment of sisters Natalie, Nichole, and April Black around 8 p.m. Shortly thereafter, Shipp, along with fellow Gangster Disciples Prentiss Phillips, James Lee White Carradine, known as "Thug Life," and "Steve," and "Chuck" arrived at the apartment. Shipp was angry and decided to "call some more Gangsters over there to Hurt Village." An aid and assist meeting was called, and according to James, twenty or thirty additional Gangster Disciples from all over Memphis arrived at the apartment for the meeting.

After their arrival, Phillips came inside the apartment and said that Vernon Green was outside "watching out at the apartment." One of the later arriving Gangster Disciples, whom James identified as the defendant, instructed Shipp and three other Gangster Disciples to "go snatch up" Vernon Green. James said Shipp and the others followed the defendant's instruction without hesitation. Green arrived at the apartment around 10 p.m., escorted by "[t]wo disciples in front [and] two disciples in the back." Green stood in the middle of the floor as the defendant asked Green if he had been outside watching for the Vice Lords. The defendant then hit Green in the face, struck Green numerous times, both with his fists and with a broom stick, and then pushed Green onto the couch. James, who had lived in the Hurt Village apartments and known Green for seven years, described Green as the neighborhood comedian and stated that Green had not been a gang member and had not been involved in the fight earlier in the day.

After Green was beaten, he was taken upstairs by "two other guys." Green remained upstairs for thirty to forty-five minutes. During this time, James was "jumped on" and "beat up" downstairs by six Gangster Disciples because he had not helped "Jarvis and them fight." James testified that Phillips came out of the kitchen, where he had been meeting with Shipp and Kevin Wilkins, known as "Big Folk," "cut on the radio and started picking out six people," who then beat James for fleeing rather than aiding Shipp during the fight with Snoop. James testified that Phillips, not the defendant, selected the gang members who beat James and that the defendant had been upstairs at this time.

Green was escorted downstairs after James was beaten, but a short time later, Green was taken from the apartment. Before Green left the apartment, James saw the defendant, Shipp, and Phillips talking together in the kitchen and overheard the defendant say, "Y'all know what to do." James believed this statement meant "[t]hey [were] going to kill [Green]." James recalled that the victim had been held at the apartment two or two and one-half hours. When asked if the victim said anything during this time, James said the victim "told Prentiss [Phillips], 'tell them folks to stop.'" When Green was escorted from the apartment by Shipp, Wilkins, Charles Golden, known as "Fufu," and Antonio Jackson, Green had been wearing a black shirt, black pants, and black shoes. Green's black shirt had been pulled over his head so that Green was unable to see or use his arms to resist. As this group left the apartment, James overheard the defendant again say, "Y'all know what to do." James also testified that the defendant at one point aimed a nine millimeter gun at his face, while threatening that the "same thing" would happen to James if James ever said "something about it." James believed the defendant's comment meant "[t]hey going to kill me too." After Green and the other gang members left the apartment, Phillips and "Steve" walked James home in the early morning hours of May 1, 1997.

James admitted that he had never seen the defendant before April 30, 1997, and that the defendant had not been a member of the Hurt Village Gangster Disciples. James maintained, however, that the defendant had been a member of the Memphis Gangster Disciples and had been present at the Hurt Village apartment on April 30, 1997.

Defense counsel on cross-examination questioned James regarding a statement he made to the police on May 8, 1997, one week after these events occurred. In that statement, James informed the police that "[he] saw Anthony, Jarvis Shipp, <u>Shaun</u>, and a big heavy-set guy that I don't know his name, Antonio Jackson, and Big Folk" kill Green. (Emphasis added.) In his May 8 statement James also said that "Shaun" instructed Shipp and three other gang members to "go snatch Vernon Green up" and that "Shaun" questioned and hit Green at the apartment. In his May 8 statement James provided the following account of the events:

> J-Roc, MacKaos, Shaun, and Low-Down went into the kitchen for a private meeting. And I heard them talking softly to each other for about five minutes. And then J-Roc and Shaun came out of the kitchen. And then MacKaos and Low-Down came out of the kitchen. And MacKaos said, you all need to take care of this and told Jarvis, what you-all do now is personal. Then MacKaos and Low-Down left.

Also in his May 8 statement, James indicated that "Shaun came up to me and said I better not say nothing to nobody, and if you think this was something let us find out that you said something about this." Although on May 8, 1997, James told the police that many gang members beat the victim, James testified at trial that only the defendant beat Green. Finally, in this May 8, 1997, statement James claimed he

> heard three cars start and heard at least six doors close. And after they left–and Prentiss had a gun in his right hand and said, if anyone say anything about this they will be dealt with. And then he said, all the gangsters in here keep this on the 1919. And after that Prentiss and Steve escorted me to my house.

When asked by police on May 8 if he had anything else to add to his statement to aid the investigation, James had replied: "All I can say is that Vernon was a good person and didn't need to be killed by anyone." When defense counsel pressed James to explain why he had mentioned the name "Shaun" and had not once mentioned the defendant's name in his May 8, 1997, statement, James replied:

> Man, hold up man. When Vernon was getting beat, man, Vernon the one who called that man Shaun. So I went by what Vernon called him.

James admitted he had not previously provided this information to police and also conceded he had not previously indicated the defendant threatened him while holding a nine millimeter gun to his head. Although James had consistently "given the same name for everybody else that did everything that night," the actions he attributed to the defendant at trial had been attributed to "Shaun" in his May 8 statement. In response to questions from defense counsel, James indicated that Phillips was "coordinator" and Shipp "chief of security" of the Hurt Village Gangster Disciples. James did not attribute a rank to the defendant, however.

-4-

On re-direct examination, James clarified his prior testimony and May 8 statement, explaining that many gang members beat the victim, but the defendant hit Green first and no other gang member beat Green at the same time as the defendant. James also explained he had not known the gang members present on April 30, 1997, by their legal names and had referred to them by their street names. James said he had never seen the defendant before that night, had not known the defendant's name, and had referred to the defendant as "Shaun" in his May 8 statement because he heard Green refer to the defendant as "Shaun." James explained that, when the police showed him a photographic array shortly after Green's kidnapping and murder, he selected the defendant's photograph but referred to the person in the photograph as "Shaun."

James maintained the accuracy and truthfulness of his May 8 statement and claimed its only error was his use of the name "Shaun" when describing the defendant's actions. James claimed he had not learned the defendant's correct name until the first day of trial. James reaffirmed his direct testimony and reiterated that the defendant gave the order to "snatch up" Green; that the defendant beat Green; that the defendant met with Phillips, Shipp, and Wilkins in the kitchen; and, that the defendant twice commented, "Ya'll know what to do." On re-cross-examination, defense counsel pointed out that, despite his proclamation to the contrary, James knew the defendant's correct name prior to trial and had used the defendant's correct name when previously testifying. Sergeant William Ashton of the Memphis Police Department corroborated James's testimony regarding the photographic array. Sergeant Ashton recalled that James identified the defendant's photograph from the array, but referred to the person in the photograph as "Shaun."

Testifying next for the prosecution, Jarvis Shipp, known also as "J-Roc," admitted he had been a Gangster Disciple and that he had held the "chief of security" rank in the Hurt Village section of the gang. Shipp corroborated James's testimony concerning the squabble between the children that led to the argument between the children's mothers that eventually escalated to the altercation between Shipp and Snoop. Shipp also corroborated James's testimony concerning James and Popcorn fleeing the fight and the gunshot injury to Popcorn.

When he arrived at the Hurt Village apartment of Natalie, Nichole, and April Black at about 9 p.m., Shipp saw James, Popcorn, Phillips, Isiah Triplett, Sepacus Triplett, Steve Hardin, and James Lee White Carradine, all members of the Gangster Disciples. The Black sisters also were present, but Phillips, the "coordinator" of the Hurt Village Gangster Disciples, ordered the Black sisters upstairs. After they complied, Phillips called an aid and assist meeting, stating that the Gangster Disciples were going to "step to another level" and retaliate against the Vice Lords. Shipp believed Phillips meant the Gangster Disciples were going back to hurt all or some of the Vice Lords as revenge for injuring Popcorn.

Shipp explained how the Gangster Disciples were organized into sections throughout Memphis. In addition to the Hurt Village section, where Phillips was the "coordinator" and Shipp the "chief of security," the Gangster Disciples had sections in Mitchell Heights, South Memphis, Scutterfield, Frayser, Watkins Manor, Binghampton, Hyde Park, Douglass, Riverside, Castalia, Whitehaven, Tulane, and Westwood. According to Shipp, "T-Money," who lived in Chicago, was the "head guy over the whole entire city" of Memphis. Kevin Foley, also known as "Kaos," was the number two person over the entire city. However, because "T-Money" was out of town, "Kaos was like the governor" over Memphis. According to Shipp, the defendant was from the Mitchell Heights section of the gang and

"at that particular time he was a active chief of security over the entire city of Memphis." As such, the defendant ranked just below Kaos, and because T-Money was out of town, the defendant effectively ranked second in the Memphis Gangster Disciples. As chief of security for Memphis, the defendant ensured that all section security chiefs were organized and gave orders when Kaos was not around to do so.

Shipp and Phillips followed the chain of command when calling the aid and assist meeting on April 30, 1997, calling first Kaos then the defendant. After these calls were made, forty to eighty Gangster Disciples from all over Memphis arrived at the apartment, and many of them were armed with handguns. After their arrival, Phillips ordered James Lee White Carradine and another person upstairs to prevent the Black sisters from coming downstairs or leaving the apartment.

Kaos arrived at the apartment about 9:30 or 9:45 p.m. The defendant arrived shortly thereafter and immediately asked Shipp, "Why aren't your guys on point?" Shipp said the defendant meant, "Why aren't your guys on security, watching out, looking?" The defendant directed Shipp, as "the security of Hurt Village" to determine the identity of the "guy peeping around the corner." After escorting the defendant inside the apartment, Shipp left to determine the identity of the person. When Shipp returned a short time later and advised the defendant that the person was Vernon Green, the defendant inquired, "Who is Vernon Green?" Phillips and others "started screaming" that Green was a Vice Lord. The defendant then ordered Shipp and five other gang members to place Green under "GD arrest." According to Shipp, the defendant meant gang members were to detain and hold Green against his will.

After locating Green, Shipp told Green "my brothers, the Gangster Disciples, wanted to speak with him," and escorted Green inside the apartment. After directing Green into the dining room, the defendant asked Green if he was a Vice Lord. When Green replied,"no," the defendant asked Green if he knew where the Vice Lords were located. When Green again replied "no," the defendant, Phillips, and Wilkins began punching, hitting, and physically abusing Green. After Green fell to the ground, Shipp asked the others gang members to "hold up" on beating Green. Shipp then assured Green "we weren't going to do nothing to him, we just wanted to know" the location of the Vice Lords. Green then said the Vice Lords were at a particular location, so the defendant ordered Shipp, and five other gang members to verify Green's information. About halfway to this location, Shipp and the others met a woman "who considered herself a sister of the Gangster Disciples." She told them the Vice Lords were "running down Danny Thomas."

Shipp and the others returned to the apartment, and when they arrived, the victim was sitting in a corner, away from the couch. According to Shipp, Green had been forced to sit in the corner because Green "had defecated on himself." Shipp and other gang members ridiculed Green for doing so. After learning the Vice Lords had not been at the location Green provided, the defendant ordered Sepacus Triplett and another gang member to take Green upstairs. Shipp went upstairs as well and saw Green lying on the floor of a bedroom with gang members standing around him pointing guns at his head and threatening to kill him. Shipp said the Black sisters were in another upstairs bedroom with a box springs mattress across the door to prevent their departure. When Shipp heard loud music and returned downstairs, Phillips and the defendant were selecting gang members and instructing them to form a circle. Phillips "told James to get in the center of the circle." Shipp said Phillips was in charge of the situation, but the defendant was advising on the proper procedure because Phillips had never

-6-

before "put a brother in violation." When asked which of the two had the higher rank, Shipp replied: "Basically, you'll say Gregory Robinson." However, Shipp qualified his reply by pointing out that these events occurred in Hurt Village, Phillips's "turf." Shipp agreed that the Gangster Disciples are structured somewhat like the United States, with a national leader and local leaders.

After James moved to the center of the circle, the defendant and Phillips announced James had "six minutes six seconds, no cover up," meaning James would be beaten for six minutes and six seconds by six people.[3] Gangster Disciples referred to this punishment as "a pumpkin head." According to Shipp, James was placed in "retirement" or "on hold" for six months and told not to consider himself a Gangster Disciple. Phillips and another individual, whom Shipp did not know, then escorted James out of the apartment.

After James left, Shipp told "the guys to bring [Green] downstairs." Green arrived downstairs with a t-shirt over his head to obstruct his sight and to restrict his hands so that he could not break away or defend himself. Shipp testified that the defendant, Phillips, and Wilkins each individually spoke to Kaos on a cellular telephone, during "one long continuous conversation." Shipp reported that after hanging up, "[t]hey said Kaos said, 'take him fishing.'" Shipp, who was not a part of the conversation with Kaos, understood this meant they were to "take [Green] way out somewhere out of the district, rough him up a little bit by physical abuse, and let him get back the best way he could." Shipp then heard the defendant direct Phillips and Wilkins to select six men to take Green to a destination. Wilkins picked Antonio Jackson, a man known as "Paris," and another individual Shipp did not know. Phillips selected Shipp, Charles Poole, and a man known as "MacEndo." Shipp testified that Wilkins, Jackson, Paris, and MacEndo were from Mitchell Heights. Shipp was from Hurt Village, and Charles Poole was from Scutterfield.

Wilkins left with the six men selected, and Phillips remained at the apartment. The men drove in two separate cars to Bellevue Park. When Green pulled the shirt from his eyes and realized he was in a dark area, he began pleading with them, saying numerous times, "just let me go, man, I'm not going to say nothing, please, just let me go." Shipp, Paris, Poole, and MacEndo physically carried Green to the top of a hill and dropped him onto the ground. Wilkins "suggested" the other men stand a few feet away from Green. Shipp testified that although Wilkins was not superior in rank to the defendant, Wilkins was the "big head" who was giving directions at the park. Wilkins kicked Green in the side and asked Green if he had any last words. Shipp then heard a gun being cocked and saw Jackson fire the gun. Green was lying face down, and bullets struck his lower back and buttocks. Green began gasping for breath and saying that he had been hit, that he was dead, and that he was not going to say anything. When Jackson remarked to Wilkins that the buckshot were not affecting Green, Wilkins asked Paris for his chrome plated automatic pistol. Wilkins handed the pistol to Jackson, who shot Green in the head. The gun jammed, but Jackson adjusted it and fired again. The gang members then fled the scene and later met at a gas station on South Parkway, where Wilkins advised them to "take the streets, act normal." Wilkins gave them marijuana to "calm us down." They met again at

---

[3]According to Shipp, James actually was beaten by twelve individuals during the six minutes, six seconds time period. Because he was a "big guy" the first six individuals "got tired" and "stopped hitting on him." At the three minute, three second mark, Phillips selected six other individuals, to continue the beating, one of whom was Shipp.

an apartment in the Mitchell Heights area. Shipp later learned this apartment belonged to "Fufu" – Charles Golden.

Two days after the murder, Phillips told Shipp to take a "six day vacation." Phillips called the defendant, and the defendant arrived and drove Shipp, his "baby's mother" and his children to a local motel. The defendant told Shipp not to answer his pager or use the telephone. However, Shipp answered a page from Phillips and learned that the police were looking for him. Shipp then paged the defendant, who immediately returned Shipp's call but reprimanded Shipp for being "a knucklehead" who disobeyed orders not to use the telephone or answer his pager. After again telling Shipp not to answer the telephone or respond to his pager, the defendant assured Shipp that he, or "other brothers," would be dropping by to check on Shipp. Three days later, the defendant sent "a guy by the name of Crenshaw and two more younger guys" to pick up Shipp and his family at the motel.

At the conclusion of his direct examination testimony, Shipp claimed that he had been threatened by Gangster Disciples for being a "snitch" and explained that he had sought protective custody because he feared he would be unable to survive in the general jail population, which included many Gangster Disciples. Shipp declared he had given truthful testimony and denied the State had offered any deals, promises, or representations in exchange for his testimony.

On cross-examination, Shipp admitted that he had given a lengthy statement to the police on May 27, 1997, and had not once mentioned the defendant's name, even though he had mentioned numerous Gangster Disciples, including Kaos, Phillips, Jackson, and Wilkins. Shipp admitted he had identified numerous Gangster Disciples when shown photographic arrays, including Kaos, Phillips, Wilkins, Jackson, Carradine, Golden, "Smash," Anthony, Johnny, and Sepacus Triplett, but had failed to identify the defendant when given the opportunity.

Although Shipp indicated in his May 27, 1997, statement that Kaos was the governor of Memphis, contrary to his trial testimony, in this same statement Shipp claimed that Wilkins, from the Mitchell Heights area, was the chief of security for North Memphis, that Phillips outranked Wilkins, and that Jackson was chief of security of Scutterfield. Furthermore, in his May 27, 1997, statement Shipp indicated that Phillips, not the defendant, instructed him to arrest Vernon Green; that Phillips, not the defendant, beat the victim; that Phillips, not the defendant, instructed gang members to take Green upstairs after he had been beaten; and that Phillips, not the defendant, decided Green's fate because Phillips and others assumed Green would "put the law in [Phillips's] business or [Green] would get the Vice Lords to retaliate against us."

On cross-examination, Shipp admitted that Shaun Washington, a Gangster Disciple from Mitchell Heights, had been present at the apartment on April 30, 1997, although he had failed to mention Shaun Washington in his May 27, 1997, statement to the police or in his direct testimony. Shipp testified that some Gangster Disciples have gold teeth, that the Gangster Disciple symbols include the six-point star, the pitchfork, the heart with wings, a crown, a "devil tail," and the world with a sword piercing it. Shipp claimed that he had never heard the phrase "take him fishing" before April 30, 1997, but he maintained he had believed the phrase meant they were to drive away and leave Green to make his own way home. Shipp admitted there had been no discussion at the park about whether or not they were to kill Green. Shipp also admitted that he had been acquainted with Green because he had dated Green's sister. Shipp conceded that he had been charged with first degree murder after

giving the May 27, 1997, statement, and that the prosecution had filed a notice of intent to seek the death penalty. When asked if he expected any consideration from the prosecution in exchange for his testimony, Shipp responded, "Yes, because the simple fact I'm facing the death penalty." When asked to clarify, Shipp stated, "If it's in the progress. If it's in the will." When defense counsel commented, "You're not up here testifying for your health, are you, sir?" Shipp responded, "I'm up here testifying to tell the truth on my behalf and on behalf of the victim's family."

On re-direct examination, Shipp confirmed that he had identified only one Gangster Disciple, Kaos, who outranked the defendant, and Shipp said he did so because "Kaos had told on" him. Shipp pointed out that the defendant, not Kaos, had taken him to a hotel and advised him how to protect himself. Shipp also claimed he had been afraid to identify the defendant because the defendant was "not playing with a full deck." Shipp maintained he had told the truth at all times, including his May 27, 1997, statement, except for his failure to identify the defendant.

On re-cross examination Shipp emphasized that he had implicated Kaos because "[e]veryone knew that Kaos was a snitch." Shipp conceded he had initially implicated and identified Phillips, even though he had testified that Phillips and the defendant were "kind of on the same level" in terms of authority. Shipp admitted he had never implicated the defendant prior to testifying at trial and acknowledged that he hoped to avoid the death penalty by testifying against the defendant.

Also testifying for the prosecution, Dr. Thomas Deering, the forensic pathologist and assistant Shelby County medical examiner who performed Green's autopsy, explained that Green had a shotgun wound and two gunshot wounds to the right side of his head, a shotgun wound across his upper back, and a shotgun wound to his left buttock. The shotgun wound to the right side of Green's head lacerated his brain and fractured the base of his skull and would have itself been fatal. Gunshot wound B, near Green's right temple, also fractured Green's skull and struck his brain and was alone "a severe if not fatal wound." Gunshot wound C began at Green's right temple, fractured his skull, broke his jawbone on the right, traveled through the back part of his tongue, and injured muscles in the right side of his neck. The shotgun wound to Green's upper back caused superficial scraping and would not have produced death in and of itself, although it would have been painful. The shotgun wound to Green's left buttock fractured the lower part of his back bone and his coccyx and also lacerated his rectum and bladder. Dr. Deering opined that the victim was alive when the various wounds were inflicted.

Dr. Deering cleaned and reconstructed the victim's skull to determine the order of the gunshot wounds. After examining the reconstructed skull and considering the level of bleeding at each wound, Dr. Deering determined that the shotgun wound to the right side of Green's head was inflicted first, that gunshot wound B was inflicted second, and gunshot wound C was next inflicted, in almost the same location as gunshot wound B. Although he could not determine if the shotgun wounds to Green's back and buttocks preceded the wounds to his head, Dr. Deering testified that the shotgun wound to Green's buttocks had a great deal of associated bleeding and would have been quite painful. Given the minimal associated bleeding, Dr. Deering opined that Green had very little blood pressure and was "in trouble" at the time Green was shot in the back.

On cross-examination, Dr. Deering agreed that he had reported no physical evidence of a severe beating. On redirect, Dr. Deering acknowledged that Green's head was so severely damaged by the gunshot wounds that physical evidence of any beating about Green's head may not have been visible.

Nonetheless, on re-cross-examination, Dr. Deering admitted that "an average-sized guy" striking "hard blows with a closed fist" to a person's head would result in visible injuries. The prosecution then rested its case.

Testifying first for the defense, James Lee White Carradine, known as "Thug Life," admitted he had been present at the Hurt Village apartment on the evening Green was kidnapped and murdered. Carradine maintained, however, that he and Isiah Triplett had remained upstairs with the Black sisters for most of the evening. Although Carradine identified several Gangster Disciples who were at Hurt Village apartment, he maintained the defendant had not been present at the apartment. Carradine said he first met the defendant at the Shelby County jail and did not know whether the defendant was a Gangster Disciple.

Carradine explained that, although a man known variously as "Greg," "MacGreg," or "Red Greg,"[4] had been present at the apartment in Hurt Village on the evening of Green's murder, the defendant was not that man. As to MacGreg's rank, Carradine stated, "I'm just not familiar. You know, he had top rank." Nonetheless, Carradine maintained that Phillips outranked "that MacGreg" and that "Kaos was the dude that was over all of it." Carradine said the person he knew as MacGreg had been present at the apartment and armed with a gun. He described MacGreg as bald, with a light mustache, very light complected, about 5'6" or 5'7" in height, with "a bunch of tattoos," and "twelve gold in his mouth," a "six-point star in the web of his hand," tattoos on his neck, body, and arms, including a "GD" tattoo, a "MacGreg" tattoo on his right forearm, and a "to the world blow" tattoo on his left arm. Carradine confirmed that he had told the police in a May 9, 1997, statement that MacGreg was chief of security and was know as the "Executioner."

On cross-examination, the prosecution pointed out that Carradine had testified similarly at Kevin Wilkins's trial, stating that he knew a person known as "Big Folk" but that Kevin Wilkins was not that person. Carradine reluctantly admitted he had been a Gangster Disciple but maintained that he had no leadership role or rank within the gang. While Carradine denied participating in the physical assault on Green, he recalled seeing the victim kneeling beside the staircase, with Shipp and six others standing around him. Carradine explained that Phillips, along with the men he knew as MacGreg and Big Folk, were "standing behind the six dudes that were around Vernon," talking on the telephone. Carradine recalled Shipp had been walking between the two groups. After Green was moved to an upstairs bedroom, Carradine heard someone telling Green "to shut up before he got killed then." Carradine confirmed that Phillips was the Hurt Village coordinator and Shipp the Hurt Village chief of security and said that MacGreg ranked "somewhere around" two or three in the Memphis Gangster Disciples.

After Carradine testified, the defendant displayed his person to the jury. The record reflects he had no tattoos on his chest, neck, or back, no "MacGreg" or "Greg" tattoo on his right arm, no star tattoos on his hands, and no tattoo of "to the world blow" on his left arm. The record also reflects that the defendant had on his left arm a tattoo of "two heart's intertwined with each other, one with the name Sardie, one with the name Samantha." Also tattooed on his left arm was the word "Red." A tattoo on the defendant's right arm was described as following in the record; "a number one with what appears

---

[4]For purposes of clarity, we will consistently use the reference MacGreg.

to be a brick of a wall with Mom and Annie on it." Finally, the record reflects that the defendant had six gold teeth on the bottom and four gold teeth on the top, for a total of ten. The letters "G" "R" "E" "G" appeared on his four top gold teeth. The record reflects there were no stars or "pitch forks or anything else on the teeth."

Annie Robinson, the defendant's mother, along with Nichole Robinson and Patricia Anne Robinson, two of the defendant's sisters, testified that the defendant never had tattoos or gold teeth as described by Carradine. The defendant's mother, along with the defendant's friends, Danny Williams and Ronald Dowell, testified that the defendant had never been a gang member.

While admitting he had been at the Hurt Village apartment on April 30, 1997, Sepacus Triplett nonetheless denied being a member of the Gangster Disciples. However, Phillips directed Triplett to "control the door," so Triplett had answered the door for "everybody" and knew "who came in and who didn't come in." Triplett said he had not seen the defendant at the apartment and believed Phillips was "in charge." On cross-examination, Sepacus Triplett admitted he had lied to the police in a statement given on May 8, 1997, and that he had pleaded guilty to facilitation in connection with Green's murder.

Frederico Mason testified that, although he was not a member of the Gangster Disciples, he had been present at the apartment on April 30, 1997. Mason had seen a man known as "MacGreg" a "couple of times at Hurt Village," but Mason did not know if MacGreg was a Gangster Disciple. Mason maintained the defendant and MacGreg were not the same man. Mason did not see the defendant at the apartment on April 30, 1997, had never seen the defendant at the Hurt Village complex, and had first seen the defendant when shown a picture by a police detective. Mason did not know if MacGreg had been at Nichole Black's apartment on April 30, 1997, because he was "going upstairs and downstairs." Mason knew Kaos but said he did not know if Kaos had been at the apartment on April 30, 1997, but Mason had seen Phillips and Shipp discussing Green's fate. When asked if he saw anyone else, Mason replied, "Like I said, them the only peoples that I just knew, you know." On cross-examination, Mason admitted he left the apartment at approximately 10 p.m. and did not return until approximately 3 a.m.

Steven Hardin testified also and admitted he had pleaded guilty to facilitation to especially aggravated kidnapping in connection with Green's kidnapping and murder. Hardin arrived at the apartment between 5:30 and 6 p.m. on April 30, 1997. Hardin said Shipp called the aid and assist meeting and many people arrived whom Hardin had never before seen. Hardin "vaguely" remembered some of the people who arrived for the meeting, and in particular, he remembered a man known as MacGreg being there that night. Hardin said MacGreg had tattoos on his hand, arms, neck, and shoulder and had a nicely trimmed "blondish beard." Hardin maintained the defendant was not "MacGreg," and said at no time during the evening did Hardin observe the defendant at the apartment. Hardin admitted that he had been "told to go upstairs by Prentiss Phillips and lookout the window and inform them" if anyone, the police, the Vice Lords, "whoever tried to come up to the apartment." Hardin stayed at his upstairs lookout post from 6:30 p.m until 12 or 1 a.m. On cross-examination, Hardin admitted that, after pleading guilty, he had feared revenge from other Gangster Disciples incarcerated with him and acknowledged that his incarceration with other gang members was a frightening situation.

April Black testified that, on the evening of April 30, 1997, she was held in an upstairs bedroom at gunpoint by members of the Gangster Disciples. Black acknowledged her acquaintance and association with members of the Gangster Disciples, including Kaos, MacGreg, and Phillips. She admitted MacGreg had been at the aid and assist meeting at her apartment, but maintained the defendant is not MacGreg. Black admitted she was serving a ten-year sentence in the Mississippi Department of Correction for armed robbery, but claimed she was not incarcerated with Gangster Disciples from Memphis. On cross-examination Black admitted her brother had been shot by Gangster Disciples in the Shelby County jail, but she denied being afraid of the gang, although admitting she was "concerned."

Horace Black, April Black's brother, admitted he had been a member of the Gangster Disciples for ten years. He also admitted knowing the defendant from jail, but said, to his knowledge, the defendant had never been a member of the Gangster Disciples. Horace Black said he did not know Kaos, despite being a gang member for ten years. On cross–examination, Horace Black admitted that he previously had been convicted of possession of a controlled substance with the intent to sell, manufacture, or deliver, and aggravated robbery.

Sergeant Richard Parker, a Memphis police officer who had been assigned to the Gang Task Force for five years, testified for the defense about gang tattoos. Sergeant Parker described the readily identifiable tattoos often used by Gangster Disciples. He stated the defendant's tattoos could "possibly" be gang tattoos, but he could not readily identify them as such. He indicated the letter "E" of the defendant's "RED" tattoo resembled a Gangster Disciple trademark, "although it was missing the post under it." He further noted that gang members often "camouflage" their tattoos, and he pointed out that tattoos can be easily changed. Sergeant Parker indicated that gang members had begun to eschew tattoos to avoid detection and explained that gold teeth, common among Gangster Disciples, can be removed and changed. Defense counsel pointed out that when he initially showed Sergeant Parker photographs of the defendant's tattoos, Sergeant Parker opined that the defendant's tattoos were not gang-related. After speaking with the prosecuting attorneys in the hall outside the courtroom, Sergeant Parker "came to the conclusion that the tattoos could possibly be gang-related."

Based upon this proof, the jury convicted the defendant of premeditated first degree murder and especially aggravated kidnapping, finding the defendant criminally responsible for the conduct of another.

The trial proceeded to the penalty phase. To establish the two aggravating circumstances – the murder was especially heinous, atrocious or cruel in that it involved torture or serious physical abuse beyond that necessary to produce death and the murder was committed during a kidnapping[5] – the prosecution relied upon the proof presented during the guilt phase of the trial and re-called Sergeant Peppers to the stand. Sergeant Peppers identified a photograph of the victim's body as it appeared when discovered in Jessie Turner Park on the morning of May 1, 1997.

---

[5]Tenn. Code Ann. § 39-13-204(i)(5), (7) (1997).

A friend of the defendant, his mother, and two of his sisters testified in mitigation. They described him as a "loving father" of seven children, ranging in age from one to six years old, a member of a large, close-knit family, a concerned and caring brother to his five sisters, and the youngest of his mother's six children and her only son. He attended church. Although he had no steady job, the defendant had been trained as a welder. Both the defendant's mother, and Debra McNeese, a mitigation specialist with Probation Management Group, testified that the defendant had a learning disability and had dropped out of school in the ninth grade. After leaving school, the defendant worked with his father at Eagle Iron Work. Testifying in his own behalf, the defendant asked the jury to spare his life so that he could see his children.

Upon finding that the prosecution had proven both aggravating circumstances beyond a reasonable doubt and that the aggravating circumstances outweighed any mitigating circumstances beyond a reasonable doubt, the jury imposed a sentence of death. The defendant appealed, and the Court of Criminal Appeals reversed the defendant's convictions and sentence of death. The State thereafter filed an application for permission to appeal. For the following reasons, we disagree with the Court of Criminal Appeals and reinstate and affirm the defendant's convictions and sentence of death.[6]

## II.  Failure to Instruct on Lesser-Included Offenses

The Court of Criminal Appeals held that the trial court erred by failing to instruct the jury on facilitation and solicitation of first degree premeditated murder and especially aggravated kidnapping. The Court of Criminal Appeals therefore reversed the defendant's convictions and remanded to the trial court for a new trial. In this Court, the State concedes that, under the circumstances of this case and the test enunciated in State v. Burns, 6 S.W.3d 453, 466-67 (Tenn. 1999), facilitation and solicitation are lesser-included offenses of first degree premeditated murder. Nonetheless, the State maintains that the evidence in this case did not justify a jury instruction on either of these lesser-included offenses.

In State v. Burns, 6 S.W.3d at 466-67, this Court explained that an offense is lesser-included if:

(a) all of its statutory elements are included within the statutory elements of the offense charged; or

(b) it fails to meet the definition in part (a) only in the respect that it contains a statutory element or elements establishing

(1) a different mental state indicating a lesser kind of culpability; and/or

---

[6]Despite reversing the defendant's conviction and death sentence, the Court of Criminal Appeals considered all the issues raised by the defendant on appeal as well as the issues appellate courts are mandated by statute to consider in capital cases. Thus, this case need not be remanded to the Court of Criminal Appeals for further consideration, and we have considered all the issues raised by the defendant as well as the mandatory statutory review issues and have concluded the convictions and sentences should be affirmed.

(2) a less serious harm or risk of harm to the same person, property or public interest; or

(c) it consists of

(1) facilitation of the offense charged or of an offense that otherwise meets the definition of lesser-included offense in part (a) or (b); or

(2) solicitation to commit the offense charged or an offense that otherwise meets the definition of lesser-included offense in part (a) or (b).

"Whether or not a particular lesser-included offense should be charged to the jury depends on whether proof in the record would support the lesser charge." Id. at 468. This Court has adopted a two-step inquiry for determining if the evidence justifies a jury instruction on a lesser-included offense. The trial court must first determine:

whether any evidence exists that reasonable minds could accept as to the lesser-included offense. In making this determination, the trial court must view the evidence liberally in the light most favorable to the existence of the lesser-included offense without making any judgments on the credibility of such evidence. Second, the trial court must determine if the evidence, viewed in this light, is legally sufficient to support a conviction for the lesser-included offense.

Id., at 469. Whether an instruction is required depends upon the evidence, not the theory of the defense or the State. State v. Allen, 69 S.W.3d 181, 188 (Tenn. 2002); State v. Richmond, 90 S.W.3d 648, 660 (Tenn. 2002). Applying these principles, we conclude that the trial court did not err in failing to instruct on solicitation and facilitation.

## A. Solicitation

A person may be convicted of solicitation if that person "by means of oral, written or electronic communication, directly or through another, intentionally commands, requests or hires another to commit a criminal offense . . . with the intent that the criminal offense be committed. . . ." Tenn. Code Ann. § 39-12-102(a) (1997). Part (c) of the Burns test, which makes solicitation a lesser-included offense, applies "to situations in which a defendant attempts to commit, or solicits another to commit, either the crime charged or a lesser-included offense, but no proof exists of the completion of the crime." State v. Ely, 48 S.W.3d 710, 719 (Tenn. 2001); See also State v. Marcum, 109 S.W.3d 300, 303-04 (Tenn. 2003) (quoting this principle and holding that the trial court did not err in failing to instruct on attempted rape where the evidence did not support an attempt but instead supported only the completed offense of rape or the defendant's claim of innocence). As in Marcum, in this case, the evidence unmistakably established either the completed offenses of murder

and especially aggravated kidnapping or the defendant's claim of innocence. Consequently, the trial court did not err by failing to instruct the jury on solicitation.[7]

### B. Facilitation

Part (c)(1) of the Burns test clearly designates facilitation a lesser-included offense of the charged offense. Burns, 6 S.W.3d at 467. Thus, facilitation is a lesser-included offense of premeditated murder and especially aggravated kidnapping. Having determined that facilitation is a lesser-included offense, we must next determine whether the evidence in this case warranted an instruction on facilitation.

> Tennessee Code Annotated section 39-11-403(a) (1997), defines "facilitation" as follows: A person is criminally responsible for the facilitation of a felony if, <u>knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2)</u>, the person <u>knowingly furnishes substantial assistance</u> in the commission of the felony.

(Emphasis added.) Criminal responsibility requires "the intent to promote or assist the commission of the offense." Tenn. Code Ann. § 39-11-402 (1997). Significantly, facilitation requires the lack of criminal responsibility intent. Thus, for a reasonable jury to find the defendant guilty of facilitation of first degree premeditated murder or especially aggravated kidnapping, the jury would have to conclude that the defendant, while lacking the intent to promote or assist the commission of either offense, knowingly furnished substantial assistance in the commission of premeditated murder and especially aggravated kidnapping. See id. § 39-11-403(a) (1997). This record contains no evidence that reasonable minds could accept to support these conclusions. As recounted in great detail above, with respect to premeditated murder, the evidence reasonably supports only one of the following conclusions: (1) Robinson was not present at the apartment, was not involved in Green's murder or the Gangster Disciples, and therefore is completely innocent; (2) Robinson is innocent because, while he gave orders, he did not order anyone to kill or kidnap Green; or (3) Robinson is guilty by criminal responsibility because he ordered other gang members to kidnap and kill Green. Considering the evidence in the light most favorable to the existence of the lesser-included offense, the evidence does not support the notion that the defendant merely furnished substantial assistance in the commission of premeditated first degree murder and especially aggravated kidnapping, without intending to promote or assist the commission of these offenses.

The Court of Criminal Appeals opined that the "knowingly furnishes substantial assistance" element of facilitation of first degree murder was supported by proof that the defendant ordered others to take Green to a secluded location. However, as the State points out, the evidence indicates that the defendant told other gang members to take the victim "fishing." Shipp testified that he had never before heard that instruction but believed it meant gang members were to take the victim "way out somewhere out of the district, rough him up a little bit by physical abuse, and let him get back the best way he could." Accepting this view of the proof, no reasonable juror could have found that

---

[7]In Burns this Court indicated the trial court should provide a jury instruction on solicitation at the new trial, even though the offense had been completed. However, this portion of Burns has been clarified in the later cases of Ely and Marcum. These cases plainly explain that instructions are not required on either solicitation or attempt where the evidence clearly establishes completion of the charged offense.

-15-

the defendant knowingly furnished substantial assistance in the commission of the murder. Indeed, under this view of the proof, Green's murder directly violated the defendant's instruction. It simply defies logic to conclude that the defendant, while not intending to aid or promote Green's murder, nevertheless ordered other gang members to take Green "out of the district, rough him up a little bit by physical abuse, and let him get back the best way he could," knowing all along that these gang members intended to kill Green. Simply put, no reasonable jury could have concluded from the evidence presented that the defendant had the knowledge required for facilitation but lacked the intent required for criminal responsibility. We therefore conclude that the trial court did not err by failing to instruct the jury on facilitation to commit premeditated murder. See Ely, 48 S.W.3d at 724 (holding that the trial court did not err by failing to instruct facilitation as no reasonable jury could believe that, although the defendant was present at the scene of the robbery, knew that the accomplice intended to commit robbery, and substantially assisted in the commission of the robbery, he "nevertheless did not intend 'to promote or assist the commission of the offense. . .'"); Burns, 6 S.W.3d at 471 (holding that the trial court did not err in refusing to instruct on facilitation because no reasonable jury could conclude that the defendant had the knowledge required for facilitation but lacked the intent required for criminal responsibility).

As to facilitation to commit especially aggravated kidnapping, the Court of Criminal Appeals explained that, although the proof established the defendant's direct participation in initially kidnapping and beating Green at the apartment, a jury could have concluded that the defendant did not intend the kidnapping be especially aggravated when he ordered gang members to take Green "fishing." Again, as explained above, from the evidence presented, no reasonable jury could have concluded that the defendant had the knowledge required for facilitation but lacked the intent required for criminal responsibility to commit especially aggravated kidnapping. Given the proof presented, the defendant was either guilty by virtue of criminal responsibility or he was innocent. Therefore, the trial court did not err in failing to instruct the jury on facilitation of especially aggravated kidnapping. The Court of Criminal Appeals's decision setting aside the defendant's convictions and remanding for a new trial therefore is reversed.

### III. Jarvis Shipp Accomplice Instruction

The defendant asserts that the trial court erred by instructing the jury they were to determine as a question of fact whether or not Jarvis Shipp was an accomplice to the crime. The State asserts the defendant waived this issue by failing to object to the charge given the jury. Alternatively, the State argues that any error was harmless because Shipp's testimony was corroborated abundantly by James's testimony and other evidence, as the Court of Criminal Appeals found.

When the facts concerning a witness's participation are clear and undisputed, the trial court determines as a matter of law whether the witness is an accomplice. Ripley v. State, 189 Tenn. 681, 687, 227 S.W.2d 26, 29 (1950); State v. Perkinson, 867 S.W.2d 1, 7 (Tenn. Crim. App. 1992). If the facts are disputed or susceptible to different inferences, the jury must decide as a question of fact whether the witness is an accomplice. Perkinson, 867 S.W.2d at 7. The test generally applied is whether the witness could be indicted for the same offense charged against the defendant. Monts v. State, 214 Tenn. 171, 191, 379 S.W.2d 34, 43 (1964).

-16-

In this case, the facts were not disputed, and the trial court should have instructed the jury to consider Shipp an accomplice as a matter of law. However, the defendant failed to object to the trial court's instruction and thus waived the issue. Furthermore, even considering the merits of the issue, the error is harmless because James's testimony and Dr. Deering's testimony sufficiently corroborated Shipp's description of the events so that the evidence is sufficient to support the jury's verdict of first degree murder. This issue is without merit.

### IV. Display of Skull and Admission of Photographs

The State next challenges the Court of Criminal Appeals's conclusion that the trial court erred both in allowing the forensic pathologist to use the victim's cleaned and reconstructed skull when testifying about the victim's injuries and in admitting into evidence certain photographs depicting the victim's body. While the State concedes that the Court of Criminal Appeals recited the correct standard of appellate review, the State nonetheless maintains that the Court of Criminal Appeals failed to apply the correct standard. According to the State, rather than determining whether the trial court abused its discretion, the intermediate appellate court independently assessed the propriety of using the skull at trial before concluding there was "*no* need for its introduction."[8] The State also relies upon several cases in which this Court rejected defense challenges to the admission of a victim's skull during a murder trial. See, e.g., State v. Pike, 978 S.W.2d 904, 925 (Tenn. 1998); State v. Cazes, 875 S.W.2d 253, 263 (Tenn. 1994); State v. King, 718 S.W.2d 241, 250-51 (Tenn. 1986); State v. Morris, 641 S.W.2d 883, 888 (Tenn. 1982).

In response, Robinson argues that this Court's prior decisions are not controlling because, unlike the defendants in those cases, he was charged with premeditated first degree murder by criminal responsibility and was not accused of actually inflicting the fatal injuries upon the victim. Furthermore, the defendant argues that Dr. Deering's thorough and clear testimony regarding the victim's injuries rendered the skull's use unnecessary. Although Robinson admits that Dr. Deering's testimony and use of the skull to explain the order of the gunshots corroborated Shipp's testimony, the defendant nonetheless maintains that the skull was not relevant to "any disputed issue in the guilt phase" of his trial. The defendant argues that, in light of the great danger of unfair prejudice, the trial court erred by allowing Dr. Deering to testify and display the skull during his testimony.[9]

---

[8]We note in this regard that the skull was not introduced into evidence and therefore was never given to the jury for inspection.

[9]To establish unfair prejudice, the defendant points out that a juror experienced a migraine headache during Dr. Deering testimony and was excused from the jury after medical personnel examined her. The defendant's assertion is without merit. We agree with and set out below the trial court's decision on this issue.

> In regard to the juror referred to by the Defendant, she experienced a migraine headache and requested Darvocet (an extremely powerful painkiller available only by prescription) for her pain. The requested medicine was unavailable to the Court, and after being examined by a doctor who confirmed that the juror did indeed have a migraine, the juror was dismissed due to the fact that the doctor stated it would take approximately two to three hours for the migraine to subside. The juror in no way, shape or form indicated or in any way implied that the skull contributed to the onslaught of her condition. The juror had obviously experienced migraine headaches before, given that she normally took Darvocet to control these headaches. The Defendant has offered no proof whatsoever that the demonstration of the skull had any connection to the juror's migraine. The Defendant does however, make much of the fact that this juror wrote the word "pain" on her notepad, and asserts that she held it up for other jurors

-17-

Admission of evidence is entrusted to the sound discretion of the trial court, and a trial court's ruling on evidence will be disturbed only upon a clear showing of abuse of discretion. See State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997). A trial court's exercise of discretion will not be reversed on appeal unless the court "applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." State v. Schuck, 953 S.W.2d 662, 669 (Tenn. 1997). When determining admissibility, a trial court must first decide if the evidence is relevant. Tenn. R. Evid. 402 ("All relevant evidence is admissible except as provided by the Constitution of the United States, the Constitution of Tennessee, these rules or other rules or laws of general application in the courts of Tennessee. Evidence which is not relevant is not admissible."); State v. James, 81 S.W.3d 751, 757 (Tenn. 2002). Evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence" is relevant evidence. Tenn. R. Evid. 401. After a court concludes evidence is relevant, the court must then weigh the probative value of the evidence against the danger the evidence will unfairly prejudice the defendant at trial. Relevant evidence should be excluded if the court determines that the probative value of the evidence "is substantially outweighed by its danger of unfair prejudice." Tenn. R. Evid. 403 (emphasis added). This Court previously has emphasized:

> Rule 403 is a rule of admissibility, and it places a heavy burden on the party seeking to exclude the evidence. Excluding relevant evidence under this rule is an extraordinary remedy that should be used sparingly and persons seeking to exclude otherwise admissible and relevant evidence have a significant burden of persuasion.

James, 81 S.W.3d at 757-58 (internal quotations and citations omitted).

Applying these principles, we conclude that the trial court did not abuse its discretion by allowing Dr. Deering to testify and display the skull to explain his testimony. Indeed, nothing in this record indicates that the trial court "applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining."

In a jury-out hearing the trial court carefully considered the defense objections, correctly summarized governing law regarding the prosecution's right to prove its case, and accurately concluded that this right may not be foreclosed by a defendant's characterization of the proof as undisputed or by a defendant's offer to stipulate or concede certain factual issues. See James, 81 S.W.3d at 761; State v. West, 767 S.W.2d 387, 394 (Tenn. 1989) (holding that the trial judge did not err by refusing to accept defendant's offer to stipulate the identity of all property when the defendant made the offer in an effort to eliminate highly emotional and prejudicial testimony); King, 718 S.W.2d at 250-51 (holding that the victim's skull and skull fragments were properly

---

to see, and that this action prejudiced the jury. The actions of this juror were made known to this Court during trial. This Court questioned two jurors in regard to this incident. One juror stated that she had not seen any such note. Another juror testified that she had seen it, stating, "It said, pain. P-A-I-N. Her head was hurting real bad. And she just wrote pain on it and held it up." It is obvious to this Court that the word pain was in reference to the migraine, and that the members of the jury who saw this note also understood the reference. Accordingly, this Court finds that the probative value of the skull was not outweighed by the danger of unfair prejudice. This issue is without merit.

admitted even though the defendant stipulated prior to trial that the victim's death resulted from a shot in the back of the head from a high-powered rifle). After acknowledging that relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, the trial court specifically concluded that the probative value of Dr. Deering's testimony and his use of the skull to explain his testimony outweighed the danger of unfair prejudice. The trial court stated: "I can't think of a better way to display and show the injuries than by use of the actual skull. I'm not sure that you could recreate that sufficient to do what I anticipate the doctor's going to do based on what I heard him do last time." Later in the proceeding while ruling upon the admissibility of certain photographs, the trial court noted that the skull was less graphic and a better aid "to demonstrate the injuries" than some of the photographs. Defense counsel apparently agreed with this assessment, stating, "[a]nd with that skull you don't have the blood and the gore that you see in those photographs. [Dr. Deering] more than adequately demonstrated to this entire courtroom in a very academic, professional fashion."

Furthermore, as the defendant correctly admits, Dr. Deering's testimony about the order of the gunshots corroborated Shipp's testimony. Indeed, it was Shipp's testimony about the order of the gunshots that Dr. Deering used the skull to clarify and explain. Such corroborating evidence clearly was relevant because it was necessary to the prosecution's case. This Court repeatedly has held that a conviction may not be based solely upon the uncorroborated testimony of an accomplice to the offense. See State v. Bane, 57 S.W.3d 411, 419 (Tenn. 2001); State v. Stout, 46 S.W.3d 689, 696-97 (Tenn.2001); State v. Bigbee, 885 S.W.2d 797, 803 (Tenn.1994). Evidence corroborating an accomplice's testimony, such as Dr. Deering's testimony, therefore certainly qualifies as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable." Tenn. R. Evid. 401. The defendant bore the heavy burden of establishing that the danger of unfair prejudice from Dr. Deering's testimony and use of the skull substantially outweighed its probative value. The trial court did not abuse its discretion by concluding that the defendant failed to meet this burden. The Court of Criminal Appeals's decision to the contrary is reversed.

The State also challenges the Court of Criminal Appeals's conclusion that the trial court erred by admitting Exhibit 10, a post-mortem photograph of the victim's right forehead. Again, admission of evidence is entrusted to the sound discretion of the trial court, and appellate courts should not reverse a trial court's admissibility decision absent a showing of abuse of discretion. Here again, no abuse of discretion has been shown. The trial court found, and the Court of Criminal Appeals agreed, that the photograph in question, Exhibit 10, along with two other photographs, Exhibits 8 and 9,[10] were relevant to show premeditation, the cause of death, and the victim's location and body position, and also were necessary to illustrate the testimony of many of the state's witnesses. Immediately upon admission of the photographs, the trial court gave the jury a limiting instruction and cautioned the jury against improperly using the photographs. The trial court did not act as a rubber stamp and admit every photograph the prosecution proffered. As previously stated, the trial court excluded certain autopsy photographs, noting their admission was not necessary because Dr. Deering had been allowed to use the victim's skull as a demonstrative aid. The trial court did not apply an incorrect legal standard. Tennessee courts follow a policy of liberality in the

---

[10]Exhibit 8 depicts the injury to the victim's buttocks. Exhibit 9 depicts the injury to the victim's back.

admission of photographs in both civil and criminal cases. <u>See</u> <u>State v. Banks</u>, 564 S.W.2d 947, 949 (Tenn. 1978). Photographs of a corpse are generally admissible in murder prosecutions if they are relevant to the issues at trial. <u>Id.</u> at 950-51. The trial court's determination that the photographs were relevant to issues at trial is not illogical nor irrational and did not cause an injustice to the defendant. As the trial court found, the photographs were relevant to several issues, illustrated and supplemented the testimony of Dr. Deering, and revealed the brutality of the attack and the extent of force used against the victim. <u>See</u> <u>State v. Smith</u>, 868 S.W.2d 561, 576 (Tenn. 1993). For all these reasons, we conclude that the trial court did not err by admitting Exhibits 8, 9, and 10 into evidence. The Court of Criminal Appeals's decision to the contrary is reversed.

### V. Sergeant Ashton's Testimony

Relying upon <u>Crawford v. Washington</u>, __ U.S. __, 124 S. Ct. 1354 (2004), defense counsel complains that Sergeant Ashton's testimony regarding Shaun Washington's identification of the defendant constituted inadmissible hearsay that violated his constitutional right to confront the witnesses against him. We agree with the Court of Criminal Appeals and the trial court that the defendant elicited this hearsay evidence and cannot complain now about its introduction. When defense counsel cross-examined Sergeant Ashton about his preparation of photo spread "GG," the following exchange occurred.

> Q:      And as case coordinator during your investigation are you aware of any other individuals that were interviewed that identified "GG," number six, as being there?
> A:      Yes, sir.
> Q:      And who would that be, sir?
> A:      Right offhand I wouldn't know. I'd have to look at my case.
> Q:      Okay. Would you please – do you have that somewhere nearby?
> A:      I believe I've got a copy of it in my office.
> Q:      Okay. Could you go obtain that?
> A:      It'd take me a few moments.
> Q:      Okay. Could you do that, sir?
> THE COURT:      What are you asking Mr. Ozment?
> MR. OZMENT:      You honor, I'm asking him to obtain whatever other identifications were made of "GG" six.

The court then recessed for the evening, and when cross-examination resumed the next day, the following exchange occurred between defense counsel and Sergeant Ashton.

> Q:      Sergeant Ashton, yesterday when we left off we were talking about the photo spread and the people that had identified people in the photo spread, correct?
> A:      Yes, sir.
> Q:      Particularly photo spread "GG," correct?
> A:      Yes, sir.
> Q:      And the last question I left on was who else identified someone out of photo spread "GG." Have you had an opportunity to check your records on that?
> A:      The best I could determine it was Christopher Lewis and Shaun Washington.

Q: Okay. So out of all the people that – when they were shown this photo spread by officers in your department that identified Gregory Robinson during the course of your investigation the only two were Christopher James and Shaun Lewis, correct – Shaun Lewis James?

A: That's what we've got in their statements, correct.

On re-direct, Sergeant Ashton testified that, while giving a statement on June 13, 1997, Shaun Washington looked at photographic array "GG" and identified the defendant as MacGreg. When asked about Washington's demeanor at the time, Sergeant Ashton responded, "He was very sure of himself." The defendant did not interpose an objection to Sergeant Ashton's testimony.

While the defendant may very well be correct that both Crawford and Tennessee Rule of Evidence Rule 803(1.1) bar hearsay statements of identification if the declarant does not testify at trial, neither Crawford nor Rule 803(1.1) is dispositive in this case because the defendant himself both elicited and opened the door to the testimony he now assigns as error. Under these circumstances, the defendant is not entitled to relief. Indeed, it is well-settled that a litigant "will not be permitted to take advantage of errors which he himself committed, or invited, or induced the trial court to commit, or which were the natural consequence of his own neglect or misconduct." Norris v. Richards, 193 Tenn. 450, 246 S.W.2d 81, 85 (1952); see also State v. Smith, 24 S.W.3d 274, 279-80 (Tenn. 2000); Tenn. R. App. P. 36(a). Thus, the defendant is not entitled to relief on this claim.

## VI. Failure to Declare a Mistrial

The defendant further maintains that the trial court erred in denying his motion for a mistrial given the prosecutorial misconduct in presenting Nichole Black's testimony. During its rebuttal, the prosecution called Nichole Black, one of the sisters held in the apartment on the night of Vernon Green's murder. Black testified that the defendant had been in the apartment on the night in question. On redirect examination, the prosecutor handed Black a photograph and asked if she could identify the person in the photograph. Defense counsel objected to the identification, and the trial court held a jury-out hearing. Ultimately, the trial court excluded Black's testimony and ordered it entirely stricken from the record because the prosecution had failed to inform defense counsel that Black had made a prior identification of the defendant. Although the trial court denied the defendant's request for a mistrial, the trial court instructed the jury to disregard Black's testimony.

The decision of whether to grant or deny a motion for a mistrial rests within the sound discretion of the trial court. A mistrial should be declared only upon a showing of manifest necessity. State v. Saylor, 117 S.W.3d 239, 250-51 (Tenn. 2003). "In other words, a mistrial is an appropriate remedy when a trial cannot continue, or a miscarriage of justice would result if it did." State v. Land, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000). Appellate courts should not reverse a trial court's decision denying a request for a mistrial absent a clear showing that the trial court abused its discretion. State v. Reid, 91 S.W.3d 247, 279 (Tenn. 2002).

The record in this case supports the trial court's decision and demonstrates no abuse of discretion. Nichole Black testified that even though the power was out in her apartment on April 30, 1997, she had observed a man for approximately thirty seconds by the light of a small pocket

-21-

pager held near her face and that the man in the photograph "looked like" the man she observed. Nichole Black had just previously testified that no one in the courtroom, including the defendant, was at her apartment the night of Green's abduction and murder. Viewing it as a whole, Nichole Black's testimony was uncertain and vague. The trial judge twice instructed the jury to disregard her testimony in its entirety. Jurors are presumed to follow the instructions of the court. Reid, 91 S.W. 3d at 279; Stout, 46 S.W.3d at 715; State v. Williams, 977 S.W.2d 101, 106 (Tenn.1998). Under these circumstances, the trial court did not abuse its discretion by denying the defendant's request for a mistrial. This issue is without merit.


### VII.  Due Process Violation: Inconsistent Theories & Evidence

In his October 2000 motion for a new trial, the defendant alleged his Due Process rights had been violated because the theory of guilt presented by the prosecution at the October 1999 trial of co-defendant Phillips was fundamentally inconsistent with and inherently contradictory to evidence and argument presented by the prosecution at his November 1998 trial.[11] The trial judge who presided at the various trials and plea colloquies related to this murder rejected the defendant's claim. The trial court noted that although "the evidence did not absolutely establish the identity of the leader at this meeting, there was ample evidence that the Defendant was a leader at that meeting. The fact that Prentiss Phillips, a co-defendant was also identified as a leader at this meeting does not render the finding that this Defendant was a leader invalid."

The defendant renewed his Due Process claim in the Court of Criminal Appeals. After announcing that the claim was a question of first impression in Tennessee, the Court of Criminal Appeals adopted the analysis of the United States Court of Appeals in Smith v. Goose, 205 F.3d 1045, 1052 (8th Cir. 2000). Consistent with the Eighth Circuit's approach, the Court of Criminal Appeals explained that, in separate trials against co-defendants for the same crime, the prosecution violates Due Process by pursuing factually contradictory theories that are at the core of the prosecution's case. The intermediate appellate court explained that to obtain relief under this approach,  a defendant must establish not only a "core" inconsistency, but also a reasonable likelihood that the outcome of the trial would have been different absent the inconsistency. Applying this test, the intermediate appellate court found that, during the separate trials of the defendant and co-defendant Phillips,  the prosecution "presented some proof and arguments which were inconsistent, contradictory, and factually irreconcilable regarding the relative rank of the defendant and Phillips." The Court of Criminal Appeals nonetheless concluded that the defendant had failed to establish a reasonable likelihood that absent these prosecutorial inconsistencies the jury's verdict in the guilt phase would have been different. However, finding a reasonable likelihood that the jury would not have imposed a sentence of death absent the inconsistencies, the Court of Criminal Appeals concluded that the defendant's sentence of death should be reversed on this ground alone.

In this Court, the State initially argues that the Court of Criminal Appeals erred in recognizing an independent Due Process bar to the prosecution's reliance and pursuit of inconsistent

---

[11]The appeal in this case has been delayed because the record was lost and had to be reconstructed and because unopposed motions requesting extensions have been granted.

theories at separate trials involving the same crime. The State concedes that a prosecutor clearly deprives a defendant of Due Process by knowingly using false evidence or argument to obtain a conviction or sentence.[12] However, citing cases from other jurisdictions, the State points out that the law is less clear as to whether Due Process precludes a prosecutor's use of factually inconsistent or contradictory theories where there is no known falsity. See, e.g., People v. Sakarias, 995 P.2d 152, 174 (Cal. 2000) ("Less clear is whether, knowing falsity aside, a prosecutor oversteps constitutional limits by asserting, in separate trials of different defendants, factually inconsistent or contradictory theories of criminal events.") The State also maintains that this Court need not definitively clarify the law in this case because the prosecution neither pursued inconsistent theories nor presented contradictory evidence at these separate trials.

In contrast, the defendant argues that the Court of Criminal Appeals correctly recognized the Due Process claim, appropriately adopted the Eighth Circuit's analysis of such claims, and accurately found a Due Process violation in this case. Nonetheless, the defendant challenges the Court of Criminal Appeals's conclusion that the Due Process violation did not affect the jury's verdict at the guilt phase of his trial.

Having thoroughly reviewed the defendant's extensive trial record, the supplemental record consisting of transcripts from the separate trials or plea colloquies of co-defendants Antonio Jackson, Prentiss Phillips, Jarvis Shipp, and Kevin Wilkins, and the very lengthy appellate briefs, we are not persuaded the prosecution pursued inconsistent theories or offered contradictory proof at the separate trials of these co-defendants.[13]

As previously detailed, the prosecution offered proof at the defendant's trial to establish that the defendant, as chief of security, ranked third in the city-wide hierarchy of the Memphis Gangster Disciples. Witnesses testified the defendant ordered other gang members to "snatch up" the victim, and that the defendant himself beat the victim at the apartment. Proof also showed that the defendant ordered others to take the victim upstairs and detain him. Witnesses testified that the defendant ordered Wilkins and Phillips to select gang members to take the victim "fishing." But, the jury also heard proof to show that Phillips was coordinator for the Hurt Village Gangster Disciples. When asked who had the higher rank, Phillips or the defendant, Shipp indicated the defendant ranked higher, but Shipp emphasized that the murder occurred on Phillips's "turf" in Hurt Village and that Phillips and the defendant were "kind of on the same level" in terms of authority. James was not asked about the defendant's rank, did not attribute a rank to the defendant, and stated he had never seen the defendant before April 30, 1997. However, James testified that Phillips held the rank of coordinator within the Hurt Village Gangster Disciples and it was Phillips whom the victim asked to stop the assault. Moreover defense counsel emphasized through cross-examination

---

[12]See, e.g., Giglio v. United States, 405 U.S. 150, 153-54 (1972).

[13]Having so concluded, we need not and do not consider the State's assertion that, even if such Due Process claims exist, such claims should be raised in a post-conviction petition not on appeal and the State's assertion that the Court of Criminal Appeals erred in adopting and applying the analytical framework articulated by the Eighth Circuit Court of Appeals. However, based upon our finding, we reject the defendant's assertion that the prosecution failed to disclose affirmative exculpatory evidence that Phillips was the highest ranking gang member and that Phillips was ultimately responsible for the murder.

that Shipp and other prosecution witnesses had initially given statements to the police implicating Phillips as the ranking Gangster Disciple responsible for the orders that resulted in the victim's murder. Indeed, both James and Shipp were closely questioned about their failure to initially implicate the defendant, and in particular, defense counsel emphasized that Shipp did not implicate or mention the defendant in his initial statement to the police but had instead named and implicated Phillips.

Both Shipp's and James's testimony conveyed Phillips's leadership role in Green's kidnapping and murder. Testimony indicated that Phillips announced the Hurt Village Gangster Disciples were going to retaliate against the Vice Lords and step up the violence to another level and that Phillips and Shipp called the aid and assist meeting. Testimony also showed that Phillips posted gang members as lookouts at the door of the apartment and in an upstairs bedroom, that Phillips accused the victim of being a lookout for the Vice Lords, and that the victim asked Phillips, rather than the defendant, to "tell them folks to stop." Furthermore, the testimony indicated that Phillips announced James would be punished for failing to aid Shipp in the fight with the Vice Lords and selected gang members to inflict the punishment. In addition there was proof that Phillips met with the defendant and Kaos. A defense witness said he heard Phillips and Shipp discussing Green's fate; and testimony indicated that Phillips, at the defendant's direction, selected three of the gang members who removed Green from the apartment. Finally, there was testimony that Phillips escorted James home and told Shipp to take "a six day vacation."

At Phillips's subsequent trial the State argued and presented evidence to show that Phillips, as coordinator, was the ranking member of the Hurt Village Gangster Disciples, called the aid and assist meeting, and gave orders to others during the meeting. There was testimony that Phillips reported the victim was outside and that Phillips stated the victim would have to be killed. The proof showed that Phillips picked other gang members, including his number two man Shipp, to be part of the group that removed Green from the apartment and killed him. However, the proof at Phillips's trial also showed that the defendant, answering Phillips's call, attended the aid and assist meeting, ordered others to "snatch up" the victim, met with Phillips in the kitchen, ordered the victim taken upstairs after the victim had been beaten. The jury at Phillips's trial also heard evidence that the defendant was Kaos's chief of security with authority to carry out orders from Kaos, that the defendant ordered the victim taken from the apartment, and that the defendant and Phillips each picked three gang members to take the victim from the apartment.

As should be apparent from these brief summaries, the prosecution did not pursue inconsistent theories or present inconsistent proof at these separate trials. As the State points out, the focus in each trial was upon each defendant's culpability, but the theory remained the same. At Phillips's trial, the prosecution focused on Phillips's culpability for the kidnapping and murder, and much of this proof related to Phillips's position as coordinator of the Hurt Village Gangster Disciples. Witnesses at Phillips's trial were familiar with Phillips's coordinator rank, but had never seen the defendant before the evening of April 30, 1997. The defendant makes much of the fact that the prosecution at Phillips's trial argued that Phillips, as coordinator of the Hurt Village Gangster Disciples, had an additional reason for participating in the victim's kidnapping and murder, stating:

> [P]art of this . . . was a personal situation. This wasn't entirely a Gangster Disciple matter. It was personal. It was a personal affront to this man's ego, this man, the

coordinator of Hurt Village. An altercation had happened on his turf between the Vice Lords and the Gangster Disciples and it diminished his power. And he wasn't going to stand for it.

The prosecution did not make this argument at the defendant's trial. And, given that this argument was completely unrelated to the defendant, the prosecution's failure to press this argument is logical. However, this argument is entirely consistent with testimony at the defendant's trial indicating that Phillips was very upset after the skirmish with the Vice Lords and called the aid and assist meeting because he wanted to step up the violence and retaliate against the Vice Lords. Thus, from our thorough review of the record and the briefs, we conclude that the prosecution did not pursue inconsistent theories at these separate trials.

By so stating, we do not intend to imply the evidence at these separate trials was identical. It was not – discrepancies exist. But these discrepancies were isolated and immaterial when taken in context and certainly do not give rise to a Due Process violation.

As a practical matter, discrepancies are commonly unavoidable when several individuals are prosecuted in separate trials for the same offense. Indeed, such trials present challenges because "the truth is clouded by secret and elaborate gang rituals; the use of two and three code names for gang members; and the commission of crimes by groups." State v. Phillips, 76 S.W.3d 1, 10 (Tenn. Crim. App. 2001). Furthermore, as the Alabama Court of Criminal Appeals noted, "evidence of criminal conspiracies hardly ever comes from ministers and civic leaders." Anderson v. State, 354 So.2d 1156, 1159 (Ala. Cr. App. 1977). This case well-illustrates that point. James and Shipp were themselves gang members, and Shipp was an accomplice to these crimes. The Court of Criminal Appeals has described James as "a rather inarticulate witness who was prone to cryptic responses." State v. Jackson, 52 S.W.3d 661, 667 (Tenn. Crim. App. 2001). This description is entirely accurate. James appeared to contradict himself while testifying at both the defendant's trial and Phillips's trial, but the prosecution did not encourage him to do so. Rather, the record suggests the prosecutors were sometimes themselves surprised or confused by his answers. At the defendant's trial, James was not asked and did not ascribe a rank to the defendant but indicated that Phillips and Shipp followed the defendant's directions without hesitation. At Phillips's trial, James first said Phillips outranked the defendant but later testified the defendant, not Phillips, had been "calling the shots" in the apartment. The prosecutors did not adopt this testimony to argue that Phillips outranked the defendant. Instead, the prosecution's evidence, argument, and theory focused upon Phillips's own statements and actions and upon Phillips's rank and authority as coordinator of the Hurt Village Gangster Disciples.

We also are not troubled, as was the Court of Criminal Appeals, by the prosecution's decision to call Shipp as a witness at the guilt phase of the defendant's trial while offering his testimony at only the sentencing phase of Phillips's trial. As previously explained, Shipp initially gave a statement to the police implicating Phillips and attributing to Phillips many of the actions he attributed to the defendant at the defendant's trial. Had Shipp been called by the prosecution as a witness at Phillips's trial and then provided testimony consistent with his initial statement to the police, the prosecution's proof at the separate trials would have been inconsistent. By choosing not to call Shipp during the guilt phase of Phillips's trial, and offering his testimony on a narrow point at the sentencing phase, the prosecution avoided even the potential for inconsistencies. Furthermore,

-25-

unlike the Court of Criminal Appeals, we do not find the prosecution's failure to question James about the defendant's rank at the defendant's trial unusual. James testified he had never seen the defendant prior to April 30, 1997, and had been a member of the East Village Gangster Disciples only three or four months at that time. Given this testimony, the prosecution had no reason to believe James knew anything about the defendant's rank. Moreover, James illustrated his lack of knowledge or uncertainty on this issue at Phillips's trial where James testified inconsistently when questioned about the relative ranks of Phillips and the defendant.

In short, the prosecution presented a consistent theory at these separate trials. The prosecution at each trial sought to establish each defendant's criminal responsibility for first degree murder and especially aggravated kidnapping by showing that each defendant held a leadership position in the gang, either citywide chief of security or Hurt Village coordinator, and that, acting in his leadership role, each defendant ordered and otherwise directed gang members to kidnap and murder Vernon Green. Accordingly, we do not agree with the Court of Criminal Appeals's conclusion that the prosecution presented factually inconsistent theories and evidence at the defendant's and Phillips's separate trials. Reversal of the defendant's death sentence on this basis, therefore, is not warranted. The defendant's sentence of death is reinstated.

## VIII. Apprendi & Ring Challenge

Having concluded that the defendant's conviction of first degree murder and sentence of death should be reinstated, we next consider the defendant's contention that his sentence should be vacated as unconstitutional because the aggravating circumstances were not charged in the indictment. As support for this claim the defendant relies upon Apprendi v. New Jersey, 530 U.S. 466 (2000) and Ring v. Arizona, 536 U.S. 584 (2002). This issue is without merit. See State v. Berry,___S.W.3d___(Tenn. 2004).[14]

## IX. Mandatory Review

Tennessee Code Annotated section 39-13-206(c)(1) (1997), mandates that this Court determine: (1) whether the sentence of death was imposed in any arbitrary fashion; (2) whether the evidence supports the jury's finding of statutory aggravating circumstances; (3) whether the evidence supports the jury's finding that aggravating circumstances outweigh any mitigating circumstances; and (4) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the nature of the crime and the defendant.

---

[14]The defendant also challenged the consecutive sentences imposed for his especially aggravated kidnapping conviction. In this Court, the defendant filed a letter of supplemental authority relying upon Blakely v. Washington, 542 U.S. ___, 124 S. Ct.2531 (2004), to support his challenge. The defendant argues that pursuant to Blakely and Apprendi, he was entitled to a jury trial on the factors supporting consecutive sentencing. The State did not respond. The record reflects that the defendant did not rely upon Apprendi in the trial court or in the Court of Criminal Appeals in support of this claim, nor did he argue in the lower courts that a jury had to make the consecutive sentencing findings. We note that several courts have rejected the defendant's contention and held that Blakely and Apprendi do not apply to the decision to impose consecutive sentences. See People v. Sykes, 16 Cal. Rptr.3d 317, 327 (Cal. App. 2 Dist. 2004) (citing cases).

A thorough review of the record reveals that the evidence is sufficient to support the jury's finding of the aggravating circumstances beyond a reasonable doubt. The jury based imposition of the death penalty upon two aggravating circumstances: "the murder was especially heinous, atrocious, or cruel in that in involved torture or serious physical abuse beyond that necessary to produce death" and "the murder was knowingly committed, solicited, directed, or aided by the defendant, while the defendant had a substantial role in committing or attempting to commit . . . kidnapping." See Tenn. Code Ann. § 39-13-204(i)(5), (7) (1997).

The defendant contends that the evidence is not sufficient to support the jury's finding of the (i)(5) aggravating circumstance because the aggravating circumstance may not be vicariously applied where, as here, the first degree murder conviction is based upon criminal responsibility. In determining whether the evidence supports a jury's finding of a statutory aggravating circumstance, the proper inquiry for an appellate court is whether, after reviewing the evidence in the light most favorable to the state, a rational trier of fact could have found the existence of the aggravating circumstance beyond a reasonable doubt. State v. Suttles, 30 S.W.3d 252, 262 (Tenn. 2000).

In Owens v. State, 13 S.W.3d 742, 760 (Tenn. Crim. App. 1999), perm. app. denied (Tenn. 2000), the intermediate appellate court approved vicarious application of the (i)(5) aggravating circumstance. The defendant in Owens hired Sidney Porterfield, her co-defendant, to kill her husband. Porterfield bludgeoned Owens's husband to death with a tire iron. Owens did not participate in the bludgeoning, and, as here, was not present when the assault occurred; yet the jury applied the (i)(5) aggravating circumstance to support imposition of the death penalty. Owens argued the jury had erred in applying the aggravating circumstance because she actually had not participated in the murderous assault. In rejecting this assertion, the Court of Criminal Appeals emphasized that the statutory language of the (i)(5) aggravating circumstance focuses on the nature and circumstances of the murder rather than the conduct or intent of the defendant. The intermediate appellate court opined that this Court had implicitly approved vicarious application of the aggravating circumstance in another case. Owens, 13 S.W.3d at 761 (citing State v. Blanton, 975 S.W.2d 269, 279-80 (Tenn. 1998) (upholding the jury's finding of the (i)(5) aggravating circumstance to support death sentence on the premeditated murder convictions despite the lack of evidence indicating that the defendant inflicted the fatal blows)). Thus, the Owens court held that the (i)(5) aggravating circumstance can be applied to support the death penalty for a defendant, who, like Owens, did not inflict the fatal blows.

Applying the analysis the Court of Criminal Appeals applied in Owens, this Court has held that the (i)(3) aggravating circumstance may not be vicariously applied. Johnson v. State 38 S.W.3d 52, 63 (Tenn. 2001). In so holding, we emphasized that, "unlike other aggravating circumstances, such as the (i)(5) aggravator, the statutory language of the (i)(3)[15] aggravating circumstance" focuses upon the defendant's actions and intent rather than upon the actual circumstances surrounding the killing. Id. Although we formally adopted the analysis of Owens, we expressly declined in Johnson

_____

[15]The statutory language provides: "[t]he defendant knowingly created a great risk of death to two (2) or more persons, other than the victim murdered, during his act of murder." Tenn. Code Ann. § 39-2-203(i)(3) (1982 & Supp. 1986).

to adopt the holding of <u>Owens</u> with respect to the (i)(5) aggravating circumstance.[16] Vicarious application of the (i)(5) aggravating circumstance now is squarely presented. Therefore, we take this opportunity to agree with the Court of Criminal Appeals and adopt the holding of <u>Owens</u>. We hold that the (i)(5) aggravating circumstance may be vicariously applied because the statutory language focuses upon the nature and circumstances of the crime, rather than the actions, intent, and conduct of the defendant. This holding breaks no new ground. <u>See</u> <u>State v. Carter</u>, 988 S.W.2d 145, 150 (Tenn. 1999) (noting that the (i)(5) aggravating circumstance focuses upon the "circumstances of the killing" and stating that "whether the defendant intended the victim's suffering is irrelevant under (i)(5)"). Thus, the defendant's assertion is without merit.

Furthermore, the evidence is sufficient to support the jury's finding of the (i)(5) aggravating circumstance. Green was "arrested" and held at an apartment where numerous armed gang members, led by the defendant, beat and threatened him. Testimony indicated that Green asked his captors for release and relief, that he appeared very frightened, that he defecated during the ordeal and was ridiculed for doing so, and that he begged his captors to let him go, promising that he would not report their crimes. Witnesses indicated that Green became even more frightened upon arriving at the park where he was murdered. There, Green's captors physically carried and dropped him on the hilltop where he was murdered. Before Green was repeatedly shot in the head, Green begged for his life. Green continued to beg for his life and cry out after being shot in the buttocks and the back. Dr. Deering opined that the gunshot wounds to Green's buttocks would have been very painful. Dr. Deering also opined that the first gunshot wound to Green's head would have been fatal. In short, the evidence clearly is sufficient to support the jury's finding that "the murder was especially heinous, atrocious, or cruel in that in involved torture or serious physical abuse beyond that necessary to produce death." This issue is without merit.

Also without merit is the defendant's claim that the (i)(7) felony murder aggravating circumstance may not be applied to impose the death penalty upon a defendant who did not personally kill the victim. <u>See</u> Tenn. Code Ann. § 39-13-204(i)(7). This aggravating circumstance may be applied upon proof that "the murder was knowingly committed, solicited, directed, or aided by the defendant, while the defendant had a substantial role in committing or attempting to commit ... kidnapping." <u>See</u> <u>id.</u> at (5), (7). The proof in this record clearly is sufficient to support the jury's finding that Green's murder was knowingly directed by the defendant while the defendant had a substantial role in committing Green's kidnapping. This issue is without merit.

Furthermore, the evidence supports the jury's determination that the aggravating circumstances outweighed the mitigating factors beyond a reasonable doubt. Additionally, there is no indication that the sentence of death was imposed in an arbitrary fashion.

---

[16]<u>Johnson</u>, 38 S.W.3d at 63 n.17 ("While we formally adopt the method used by the <u>Owens</u> Court in analyzing this issue, we do not necessarily adopt the conclusions of that court in applying this analysis to any aggravating circumstance other than the (i)(3) aggravator.")

We must next conduct a comparative proportionality review. Addressing this issue, the Court of Criminal Appeals held the death sentence disproportionate.[17] We disagree. Statutory comparative proportionality review is an additional safeguard against arbitrary and capricious death sentences. State v. Bland, 958 S.W.2d 651, 663 (Tenn. 1997); Tenn. Code Ann. § 39-13-206(c)(1)(D). Our function in performing this review is not to search for proof that a defendant's death sentence is perfectly symmetrical with the penalty imposed in all other first degree murder cases, but to identify and invalidate the aberrant death sentence. State v. Godsey, 60 S.W.3d 759, 782 (Tenn. 2001); Bland, 958 S.W.2d at 665. In conducting comparative review, we do not act as a "super jury," nor do we second-guess the jury's decision. Bland, 958 S.W.2d at 668. A death sentence is aberrant, and thus disproportionate, "[i]f the case, taken as a whole, is plainly lacking in circumstances consistent with those in similar cases in which the death penalty has been imposed." Bland, 958 S.W.2d at 665.

"Selecting similar cases . . . for comparison is not an exact science." Id. at 667. "Not included in the pool of similar cases are first degree murder cases in which the State did not seek the death penalty or first degree murder cases in which a sentence other than death was agreed upon as part of a plea bargaining agreement." Godsey, 60 S.W.3d at 784. Comparative proportionality review is not a search for disproportionate or aberrant life cases. Id. As the United States Supreme Court explained:

> Since the proportionality requirement on review is intended to prevent caprice in the decision to inflict the [death] penalty, the isolated decision of a jury to afford mercy does not render unconstitutional death sentences imposed on defendants who were sentenced under a system that does not create a substantial risk of arbitrariness or caprice.

Gregg v. Georgia, 428 U.S. 153, 203 (1976); Godsey, 60 S.W.3d at 784-85.

After identifying similar cases, this Court carefully examines the facts of the crimes, the characteristics of the defendants, and the aggravating and mitigating factors in the case on appeal and the similar cases. Godsey, 60 S.W.3d at 782; Bland, 958 S.W.2d at 664. While the aggravating and mitigating circumstances are important for comparison purposes, this Court considers many variables including: (1) the means of death; (2) the manner of death (e.g., violent, torturous, etc.); (3) the motivation for the killing; (4) the place of death; (5) the similarity of the victims' circumstances including age, physical and mental conditions, and the victims' treatment during the killing; (6) the absence or presence of premeditation; (7) the absence or presence of provocation; (8) the absence or presence of justification; and (9) the injury to and effects on non-decedent victims. Bland, 958 S.W.2d at 667 (citing cases). In addition, several criteria are relevant to a comparison of the characteristics of defendants, including: (1) the defendant's prior criminal record or prior criminal activity; (2) the defendant's age, race, and gender; (3) the defendant's mental,

---

[17]Apparently, the Court of Criminal Appeals addressed this issue in the interest of judicial economy. Under most circumstances, appellate courts should refrain from conducting a comparative proportionality review if the capital case is being reversed and remanded for a new trial or a new sentencing hearing. See, e.g., State v. Bondurant, 4 S.W.3d 662, 675 (Tenn. 1999); Carter, 988 S.W.2d at 153.

emotional or physical condition; (4) the defendant's involvement or role in the murder; (5) the defendant's cooperation with authorities; (6) the defendant's remorse; (7) the defendant's knowledge of helplessness of victim(s); and (8) the defendant's capacity for rehabilitation. Id.

Mindful of these factors, we have compared the defendant's sentence to the sentence imposed in similar cases in the relevant pool and have determined that the death sentence imposed upon the defendant is not disproportionate. As the State points out, the death penalty has been imposed and upheld in at least five other execution-style first degree murder cases. See State v. Reid, 91 S.W.3d 247, 287 (Tenn. 2003); State v. Austin, 87 S.W.3d 447, 465 (Tenn. 2002); State v. Howell, 868 S.W.2d 238, 262 (Tenn. 1993); State v. Van Tran, 864 S.W.2d 465, 482 (Tenn. 1993); State v. Harris, 839 S.W.2d 54, 77 (Tenn. 1992). Furthermore, the death penalty has been imposed in several cases in which the jury found the same two aggravating circumstances as those relied upon by the jury to support imposition of the death penalty in the defendant's case. See State v. Morris, 24 S.W.3d 788, 791 (Tenn. 2000); State v. Mann, 959 S.W.2d 503, 504 (Tenn. 1997); State v. Hall, 958 S.W.2d 679, 683 (Tenn. 1997); State v. Barber, 753 S.W.2d 659 (Tenn. 1988); State v. Zagorski, 701 S.W.2d 808, 811 (Tenn. 1985). Perhaps most significantly, however, the death penalty has been imposed and upheld in several other cases in which the defendant, like the defendant in this case, was not present at the scene of the murder. Austin, 87 S.W.3d at 465-66; State v. Stevens, 78 S.W.3d 817, 823 (Tenn. 2002); State v. Hutchison, 898 S.W.2d 161, 164 (Tenn. 1994); State v. Porterfield and Owens, 746 S.W.2d 441, 444 (Tenn. 1988).

The Court of Criminal Appeals distinguished these cases, noting that this case does not involve a "murder for hire." While this clearly is a distinction, it is not a difference that renders these cases wholly irrelevant for comparative proportionality review. Motive is merely one factor to be considered. Proof that the defendant had the authority to direct this murder *without* providing remuneration to the perpetrators does not mitigate his culpability.

The intermediate appellate court also distinguished this case on the basis that there was no evidence the murder was carefully planned. We disagree. The record establishes that the victim was held at the apartment several hours, and during this time, the defendant and other gang leaders met several times in the kitchen and also spoke several times on the telephone to discuss the victim's fate. At the defendant's direction, Phillips and Wilkins hand-selected gang members to take the victim from the apartment. This circumstantial evidence indicates that the victim's murder was planned by several gang members, including the defendant.

Another factor influencing the Court of Criminal Appeals's decision to find the sentence disproportionate was the lack of evidence indicating the defendant instructed other gang members how to commit the murder. Again, we disagree that this lack of evidence is unique. For example, there was no evidence in Owens to suggest that the defendant instructed Porterfield to bludgeon her husband to death with a tire iron. The lack of definitive evidence[18] suggesting the defendant told

---

[18] Evidence indicates the defendant told other gang members to take the victim "fishing." The record reflects the gang had a language all its own. James testified he heard the defendant twice tell other gang members "Ya'll know what to do."

other gang members how to commit the murder does not render the death sentence comparatively disproportionate, although this is a fair point to argue as mitigation in a capital sentencing proceeding.

Although differences exist between this case and the similar cases listed above, we have previously indicated that comparative proportionality review "is not a search for proof that a defendant's death sentence is perfectly symmetrical." Bland, 958 S.W.2d at 665. Indeed, "no two defendants and no two crimes are precisely alike." State v. Bane, 57 S.W.3d 411, 429 (Tenn. 2001). We are unable to conclude that this case is "plainly lacking in circumstances consistent with those in similar cases in which the death penalty has been imposed."

The Court of Criminal Appeals also based its finding of disproportionality on its conclusion that no rational basis justified imposing a death sentence upon the defendant and a sentence of life imprisonment without the possibility of parole upon Phillips. In so holding, the lower court relied upon this Court's decision in State v. Cauthern, 967 S.W.2d 726, 741 (Tenn. 1998), for the proposition that disparate sentences between co-defendants render the capital sentence disproportionate unless there is a rational basis for the disparate sentences. As the State points out, the disparate sentences at issue in Cauthern were initially imposed by the same jury. The intermediate appellate court also failed to note that this Court has emphasized and reiterated that a death sentence is not disproportionate "merely because the circumstances of the offense are similar to those of another offense for which a defendant has received a life sentence." Austin, 87 S.W.3d at 465; State v. Hall, 976 S.W.2d 121, 135 (Tenn. 1998). Furthermore, this Court has often stressed that a jury's isolated decision to afford mercy does not render a death sentence disproportionate, unless the death sentence is aberrant, i.e., the case, taken as a whole, is plainly lacking in circumstances consistent with other cases in which the death penalty has been imposed. As previously explained, the death sentence in this case is not aberrant.

The defendant's and Phillips's cases are extremely similar, as the State concedes. Nonetheless, differences significant to comparative proportionality review exist. Most importantly, Phillips's jury found only one aggravating circumstance – that the murder was committed in the course of a kidnapping. Tenn. Code Ann. § 39-13-206(i)(7) (1997). Furthermore, although Phillips was the Hurt Village Gangster Disciples coordinator, the defendant ranked third in the citywide hierarchy of the Gangster Disciples and bears more of the responsibility for Green's murder. For all these reasons, we conclude that the defendant's sentence of death is not disproportionate to the sentence imposed in similar cases, considering both the circumstances of the crime and the defendant.

## X. Conclusion

We have considered the entire record in this case and find that the sentence of death was not imposed in any arbitrary fashion, that the sentence of death is not excessive or disproportionate, and that the evidence supports the jury's finding of the statutory aggravating circumstance and the jury's finding that these aggravating circumstances outweighed mitigating factors beyond a reasonable doubt. We have also considered the defendant's remaining assignments of error and conclude that none warrant relief. With respect to issues not specifically addressed herein, we affirm the decision

of the Court of Criminal Appeals, authored by Judge Joe G. Riley, and joined by Judge David Hayes and Judge John Everett Williams. The defendant's convictions and sentences are affirmed. The sentence of death shall be carried out as provided by law on the 11th day of May 2005 unless otherwise ordered by this Court or other proper authority. It appearing that the defendant is indigent, costs of this appeal are taxed to the State of Tennessee.

 

 

_____

FRANK F. DROWOTA III,
CHIEF JUSTICE