IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 19, 2012

**STATE OF TENNESSEE v. MARCUS TERRELL CHURCH**

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2009-A-583     J. Randall Wyatt, Jr., Judge**

---

**No. M2011-01770-CCA-R3-CD - Filed June 10, 2013**

---

Defendant, Marcus Terrell Church, was indicted by a Davidson County Grand Jury for aggravated robbery and especially aggravated kidnapping. His first trial ended in a mistrial. At a subsequent trial, Defendant was convicted as charged. The trial court imposed concurrent sentences of  fifteen years as a Range II offender for aggravated robbery and twenty-five years as a Range I offender for especially aggravated kidnapping. On appeal, Defendant argues: (1) the trial court erred in denying his motion to suppress identification evidence; (2) the trial court improperly admitted evidence that Defendant committed an unrelated purse-snatching during the kidnapping in this case; (3) the trial court erred in admitting hearsay testimony concerning Defendant's nickname; and (4) the trial court improperly sentenced Defendant.  After a thorough review of the record, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court.  JOSEPH M TIPTON, P.J. filed a separate concurring opinion, and JOHN EVERETT WILLIAMS, J., also filed a separate concurring opinion.

Dawn Deaner, District Public Defender; Jeffrey A. DeVasher, Assistant Public Defender, (on appeal); and Jonathan F. Wing and Kristin Stangl, Assistant Public Defenders, (at trial), Nashville, Tennessee, for the appellant, Marcus Terrell Church.

Robert E. Cooper, Jr., Attorney General and Reporter; Clark B. Thornton, Assistant Attorney General, Victor S. (Torry) Johnson, III, District Attorney General; and Ben Ford and Elizabeth Foy,  Assistant District Attorneys General, for the appellee, the State of Tennessee.

## OPINION

### I. Background

*Suppression Hearing*

Detective Christopher Brennan of the Metropolitan Nashville (Metro) Police Department, West Precinct Investigation Division, was assigned to investigate the kidnapping in the present case. He developed a lead on a suspect from a fingerprint identification that he received on April 2, 2008. The print matched that of Defendant. Detective Brennan testified that the victim had also given information that his abductor went by the nickname of "Rell" or "Rail." A search of a police database matched Defendant with the nickname of "Rell." Detective Brennan found a "mug shot" of Defendant and put together a photographic line-up with Defendant and five other individuals. He showed the line-up to the victim, and the victim identified Defendant within twenty seconds of looking at the photographs. The victim was one-hundred percent certain of his identification. Detective Brennan testified that he then told the victim that the photograph matched the identification from the fingerprint and that he would be obtaining a warrant against Defendant.

On cross-examination, Detective Brennan testified that the kidnapping was alleged to have occurred on March 31, 2008, and he received the report on April 2, 2008. He spoke with the victim on the night of April 7, 2008, at approximately 11:40 p.m. The victim did not know the exact length of time that he was kidnapped and held in his own car, but he gave a time frame. Detective Brennan placed in the report that the victim was placed in the trunk of his car at approximately 2:00 a.m. and was released sometime the following evening.

Detective Brennan testified that he called the victim before showing him the line-up, but did not give him any information. He only advised the victim that he had put together a photographic line-up that he needed the victim to look at. He also read instructions to the victim before the victim viewed the line-up. Detective Brennan testified that the description of the suspect in the police report was that of a black male, approximately 5'4" tall, 170 pounds, with black hair, and long sideburns. Detective Brennan testified that the individuals in the line-up were bald with goatees. He said that the picture of Defendant came from a computer database. The victim told Detective Brennan that he had not previously seen Defendant.

*Trial*

On the evening before March 31, 2008, the victim, Byron Brandon, had been at his girlfriend's house in North Nashville drinking beer and using cocaine. After being at the house five or six hours, he eventually left in his light blue Jaguar. On his way back home to Hayes Manor, the victim drove down Jefferson Street and pulled into the parking lot of Paul's Market because he was low on gas. He thought that he pulled in at approximately 1:00 a.m. The victim then decided not to get gas at the market because there were "too many people for [him] to stop. [He] just didn't feel comfortable." As the victim was stopped waiting for traffic to clear so he could pull out, a man approached the victim's open window with a gun and said, "All right, we got ya." The man, later identified as Defendant, got in the passenger side of the victim's car, pointed the gun at the victim, and demanded his ATM card. Defendant then asked about the victim's money, and the victim told Defendant that he had four or five dollars in his pocket; however, the victim actually had twenty-dollars that he planned to use to buy gas.

The victim testified that Defendant then said, "Well, I want you to drive where I want you to go." The victim thought that he would be killed or robbed. He said that he began driving while Defendant pointed the gun at him and said, "I got you. What you going to do." After the victim drove past Hadley Park, Defendant told him to drive into an alley. After he pulled into the alley and stopped the car, Defendant directed the victim to turn the car off and hand him the keys. He then told the victim to open the trunk and climb inside. Defendant got back into the car and began driving around.

The victim estimated that he was in the trunk for at least four or five hours, and at some point, he heard multiple people talking outside the car. The victim testified that he eventually pulled an access latch in the truck and crawled into the backseat of the passenger compartment. Defendant then ordered him back into the trunk and hit him on the head with the gun causing him to bleed. The victim crawled back into the trunk, and Defendant continued driving. Once the victim got back into the trunk he had no "idea" how long he was inside, "but [he] [knew] it had to be a while because it was dark." The victim testified that he was able to communicate with Defendant through the trunk. He said that Defendant told him, "you might as well do what I am telling you to do cuz [sic] it is over anyway." The victim attempted to pull the latch a second time but the seat had been secured with "shoestrings" and would not fall down. The victim testified that the car eventually stopped, and he heard a female voice. He said, "She was just kind of curious of where he got the car." The victim testified that the car stopped again, and Defendant finally released him from the trunk somewhere in North Nashville and said, "All right. You can go now." The victim testified that Defendant walked off with his cell phone, wallet, license, money, and "everything."

The victim testified that he climbed out of the trunk and drove home to his mother's house. He spoke with his mother and then called 911. Police arrived, and he was later taken by ambulance to Meharry Hospital where he received three stitches for a cut on his elbow. The victim later spoke with a detective who showed him a photographic line-up. He identified a photograph of Defendant as the person who committed the offenses. The victim testified that there were blood spots on the trunk, bumper, side panel, and driver's seat of his car that came from the cut to his elbow. The victim testified that he worked twenty-eight years for the Ford Motor Company until he had a stroke. He had been disabled for ten years due to the stroke, which caused him problems with walking and memory.

On cross-examination, the victim was extensively cross-examined about various inconsistencies between his trial testimony, his testimony at the 2010 trial that ended in a mistrial, and his statements to police. The victim admitted that he "had a struggle with cocaine." However, he said that it did not affect his perception on the night of the offenses. The victim testified that he arrived at his girlfriend's house at approximately 5:00 p.m. on March 30, 2008, and he left at approximately 12:00 a.m. on March 31, 2008. He said that Defendant had cocaine with him when he got into the victim's car, and he showed it to the victim. The victim testified that the cocaine remained in Defendant's lap while Defendant was holding the gun, and the victim was driving. The victim said: "I am telling the jury that I was forced into driving where I - where he told me to drive, said that if I got here 'I can give you this if you want it.'" He said that Defendant offered the cocaine as a bribe, but at the same time he was pointing the gun at the victim saying, "I got ya." The victim admitted that he may not have mentioned the cocaine to officers or in any of his previous testimony. He did not recall the exact time that he stopped at Paul's Market, but said that he arrived home at approximately 3:00 a.m.

The victim testified that while he was in the trunk, Defendant stopped to get gas using some of the victim's money. He said that Defendant took money from his pocket and from the glove compartment of the car. The victim had not previously mentioned those details to anyone. He testified that he did not know anyone at Paul's Market and did not know that it was a place where people bought drugs. The victim testified that some women at the market asked him for a ride, and he said, "No." He said that a man then got into his car, then got out, and handed a gun to Defendant and said, "All right. You do it." The victim testified that he did not mention the second man to Officer Herndon or Detective Brennan when he spoke with them. He told Officer Herndon that Defendant approached him and said that he liked the victim's car and wanted to drive it. Defendant then got into the car after the victim said that he could not drive it.

The victim testified that it was dark when he was released from the trunk; however, he acknowledged previously testifying that it was daylight when he was released. The victim

further testified that Defendant exited a green Cadillac at Paul's Market, but he did not see the car when he was released. On the date of the offenses, the victim admitted that he did not tell medical personnel that he had been drinking alcohol or using drugs. He further did not tell Officer Herndon or Detective Brennnan that he had used drugs or that Defendant had showed him some cocaine.

Officer Daniel Herndon testified that he responded to a call at 712 Rowan Drive at approximately 9:00 p.m. He spoke with the victim and the victim's mother, Dorothy Brandon. The victim had abrasions to his forehead and right arm, and there was a gash on his right elbow. Officer Herndon called an ambulance due to the severity of the victim's injuries. He testified that the victim was coherent and seemed very exhausted. The victim provided a physical description of the person who kidnapped him and a description of the weapon used. Officer Herndon observed blood on the back of, and inside, the victim's car.

On cross-examination, Officer Herndon testified that the victim told him that the encounter began at approximately 2:00 a.m. at Paul's Market. Officer Herndon described Paul's Market as a high crime area. The victim did not mention that he had been using drugs or that Defendant showed drugs to him while in the car. The victim also did not say that Defendant offered him drugs in exchange for a ride. Officer Herndon testified that the victim indicated that he was released from the trunk at approximately 6:30 p.m.

According to the victim, the incident lasted eighteen hours. The victim told Officer Herndon that one person got into the car at Paul's Market, and there were others in the car later. The victim described his kidnapper as being a black male, 5'4" with black hair, and long sideburns. Officer Herndon did not recall the victim mentioning a hat. The victim said that he was hit on the head with a gun when Defendant opened the trunk to get CDs. Officer Herndon said that he would have made notes if the victim had mentioned multiple assaults. The victim told him that he saw Defendant get into a green Cadillac after the victim got out of the trunk. The victim also said that he was let out of the trunk at 21st Avenue and Buchanan Street, not in an open field.

Dorothy Brandon, the victim's mother, testified that she was at home on March 31, 2008, when the victim returned home. She said that the victim was bleeding and indicated that someone held him with a gun at Paul's "filling station." Ms. Brandon testified that they waited a few minutes and then called 911. She saw blood "all over" the victim's car and in the trunk. Ms. Brandon testified that the victim had been "a little slow" since suffering a stroke.

Officer Lynette Mace, of the Metro Police Department Technical Investigation Section ID Unit, testified that she processed the victim's car for fingerprints. She said that

the vehicle had a significant amount of blood in the trunk, outside of the car, and on the driver's seat. Officer Mace developed some latent fingerprints on the trunk lid, exterior driver's door, the exterior right front door, and the area behind the right rear door of the vehicle. She also found a prescription bottle in the vehicle belonging to Anissa Watkins.

Officer Linda Wilson, of the Metro Police Department Identification Division maintained latent print files and was an expert in fingerprint analysis. She examined the prints lifted in the present case and testified that a right palm print from the victim's car was identified as belonging to Defendant. Other prints taken did not match anyone in the AFIS System.

Anissa Watkins testified that she was at a Circle K convenience store near Tennessee State University mid-day on March 31, 2008. Ms. Watkins had walked inside the store to inquire about the air machine, and as she was walking out, she saw a man reaching into her car. The man pulled her purse out, got into a light blue Jaguar, and sped away. Ms. Watkins testified that her purse contained a prescription, ruby and diamond earrings, a credit card, and her driver's license. The man who took her purse appeared to be in his 20's, and she thought there were two people on the front seat. She also testified that there could have been others in the car.

Everett Brewer testified that he was incarcerated on a federal firearms charge. He had signed papers for a plea agreement, but had not yet been sentenced. Mr. Brewer testified that he faced a sentence of 180 to 200 months. As part of his plea, he agreed to cooperate on certain other cases. Mr. Brewer testified that as a result of his cooperation, three individuals had been arrested and convicted. Mr. Brewer testified that his testimony had to be truthful or he would face the maximum penalty under federal law. He acknowledged that he had several prior convictions.

Mr. Brewer testified that he met Defendant while incarcerated at the Criminal Justice Center when Defendant was a third shift "rock man" or trustee. He and Defendant were eventually moved into the same "pod" but they did not share a cell. Mr. Brewer testified that he became a trustee, and he and Defendant "became even closer." He said that they discussed Defendant's case. Mr. Brewer testified:

> One particular night he was telling me about, well, he kept asking me, you know, did I think that, you know, that if he could beat his charge and I told him, you know, only he knew that, only he knew what he had done and one night we were sitting in the little room and he got to talking to me and just kind of telling me, he told me, you know, some specifics on that particular night.

-6-

He told me that he had been doing powder cocaine and then when the cocaine and the money ran out that he went to a - I want to say a convenience store gas station that he was looking for somebody slipping, he said, that uh you know a lot of the little drug dealers were known to come to frequent that store and a lot of them had a tendency to pull up and get out of their cars and leave the vehicle running and left an opportunity for him to jump in the vehicle and take off, you know, strip the car for the rims, stereo system, whatever he could get out of it and he told me that while he was hanging out around the store that he ran in - he encountered an individual and he didn't tell me, you know, how he got [up on] the individual but he told me that he encountered the individual and that had took him at gun point, that they had left the store, and that he had took the individual and put him in the trunk of his car of the individual's car that he had taken and that they were riding around - that he was riding around, driving around in the individual's car and at some point after he had put the individual in the trunk he had heard a noise or happened to look in the rear-view mirror and noticed that the individual had, uh, had come from the trunk, was coming through the backseat, that somehow he had managed to maneuver the seat so he could come through there.

He told me that the pistol that he had laying on his lap that he kind of slowed down turned around and pointed the gun at the individual and when he wouldn't get, when the individual kept trying to come back he hit him a couple of times in the face or head area and pointed the gun at him again and made him get back and the individual retreated back into the trunk.

Shortly after he said that he pulled over and kind of fixed the seat back and then sometime after that that he was riding around and picked up a couple of his homeboys is what he said and I told him that, I made the statement that he was lucky that they didn't call his name, you know, say his name and said that they were calling him by his nickname which was Rell, that they never mentioned his real name, that they only said Rell.

They had rode around for a while getting high, snorting cocaine and eventually he dropped those two individuals off and went back to where he had his, in the vicinity of where he had his car parked, and said that after he had got out of the car that he had dropped the trunk where the individual was locked up at and proceeded to walk and got in his car and he left the individual.

Mr. Brewer testified that Defendant indicated that he had been driving a Cadillac.

Mr. Brewer testified that he did not discuss Defendant's case with anyone else, and Defendant had only shown him a document indicating that the victim had contradicted himself. He said that he had helped Defendant re-write two letters to his attorney.

On cross-examination, Mr. Brewer testified that Defendant would ask him questions about certain things because he "had been to the penitentiary and [he] had studied some law." Mr. Brewer testified that he and Defendant did not discuss the State's witnesses or their testimony, and Defendant felt that the State did not have a strong case. He said that Defendant never showed him discovery from the case, and he did not view any police reports or the warrant in Defendant's case. Mr. Brewer agreed that he testified against Defendant in order to "somewhat" help himself, and there was a possibility that the federal prosecutor would recommend a lesser sentence in his case.

Detective Christopher Brennan of the Metro Police Department testified that he was assigned to investigate the present case. After receiving the report of the kidnapping and robbery, Detective Brennan called the victim to review his side of the story to see if it matched the officer's report. He also stopped by Paul's Market to see if there was any video surveillance, but the store did not have surveillance tapes. Detective Brennan testified:

> Then two nights later I received an email from the latent print section saying that they had received a fingerprint hit on the fingerprints that the crime scene officer lifted from [the victim's] vehicle. I was able to run that name through our nickname database that is entered when people are arrested, if they have a nickname it goes in a database that we keep.
>
> The nickname that [the victim] had thought that he had heard the suspect called while he was in the trunk of the car matched the nickname that the defendant had used previously at one point in time, the nickname of Rell.
>
> At that point I put together a photo line-up and called [the victim] on the, I believe it was on the 7th and took that out and showed that to him where he positively identified the defendant as the person who committed the crime against him. At that point I took warrants out on the defendant.

Detective Brennan testified that within approximately twenty seconds after viewing the photographic line-up, the victim identified Defendant as the person who robbed and kidnapped him. The victim also indicated that he was one-hundred percent sure of his identification. Detective Brennan then went to night court and obtained warrants on Defendant.

On cross-examination, Detective Brennan testified that it was his understanding that the offenses began at 1800 Jefferson Street. He said that the area was a high traffic and high crime area. Detective Brennan testified that he was familiar with the term "crack pawn." He explained that it was a term "generally labeled as a person doesn't have enough cash or any money to buy drugs so they will trade whatever they have be it jewelry, vehicles, anything of that sort."

Detective Brennan testified that the victim indicated that the incident began at approximately 2:00 a.m., and he was freed from the trunk at approximately 6:30 p.m. The victim told him that one person, not two, got into the car with him at Paul's Market. Detective Brennan testified that the victim described Defendant as being a 5'4" black male with long, dark sideburns, and black hair. He said the victim indicated that he received a head injury when Defendant opened the trunk to change the CD, not after he attempted to crawl into the passenger compartment from the truck of the car. Detective Brennan testified that although the victim did not mention anything about a Cadillac to him, it was listed in Officer Herndon's report. Officer Herndon's report also indicated that the victim attempted to escape from the trunk through the back seat and that the seat was pushed back and the seat belts were buckled to prevent a further attempt at escape. The victim told Detective Brennan that he was released from the trunk near 21st Avenue and Buchanan Streets, not in an open field. Detective Brennan testified that the victim did not mention that Defendant had shown him drugs or offered drugs in exchange for a ride.

Hugh Coleman, an investigator with the Davidson County District Attorney's Office, testified that he determined that Defendant had a MySpace account, and he subpoenaed the records from the account. Mr. Coleman testified that the nickname on Defendant's MySpace account was "Rell." He identified a printout of the subscriber information and user number for Defendant's MySpace account. Mr. Coleman also identified a message from "Rell" that was sent from Defendant's account, and there was a photograph posted on the page. On cross-examination, Mr. Coleman testified that none of the pictures on Defendant's MySpace page showed Defendant with hair or sideburns.

## Analysis

### A. Motion to Suppress Identification

Defendant argues that the victim's identification from the photographic lineup should have been suppressed "because the identification procedures used by police deprived him of his rights to a fair trial and due process of law, in violation of the Fifth and Fourteenth Amendments to the United States Constitution and Article I, sections 8 and 9 of the Tennessee Constitution."

The findings of fact made by the trial court at the hearing on a motion to suppress are binding upon the reviewing court unless the evidence in the record preponderates against the trial court's findings. *State v. Ross*, 49 S.W.3d 833, 839 (Tenn. 2001). However, the application of the law to the facts found by the trial court are questions of law that this Court reviews *de novo*. *State v. Daniel*, 12 S.W.3d 420, 423 (Tenn. 2000) (citations omitted). "Absent a showing by the defendant that the evidence preponderates against the judgment of the trial court, [the reviewing court] must defer to the ruling of the trial court." *State v. Robinson*, 146 S.W.3d 469, 516 (Tenn. 2004) (citing *State v. Cribbs*, 967 S.W.2d 773, 795 (Tenn. 1998)).

A pre-trial identification process may be unlawful "if, under the totality of the circumstances, the procedure is unnecessarily suggestive." *Robinson*, 146 S.W.3d at 516 (citing *Stovall v. Denno*, 388 U.S. 293, 301-02, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967)). "Suggestive confrontations are disapproved because they increase the likelihood of misidentification, and unnecessarily suggestive ones are condemned for the further reason that the increased chance of misidentification is gratuitous." *Neil v. Biggers,* 409 U.S. 188, 198, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972).

In *Biggers,* the United States Supreme Court established a two-part analysis to assess the validity of a pre-trial identification. *Id*., at 198-200, 93 S.Ct. at 382. This standard has been adopted by our State's supreme court. *See Bennett v. State*, 530 S.W.2d 511, 512-15 (Tenn. 1975). First, the court must determine whether the viewing process was unduly suggestive. *Biggers*, 409 U.S. at 198, 93 S.Ct. at 382. A violation of due process has occurred when there is "'a very substantial likelihood of irreparable misidentification.'" *State v. Chapman*, 724 S.W.2d 378, 380 (Tenn. Crim. App. 1986)(quoting *Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968)).

Second, if the identification was unduly suggestive, the court must determine, under the totality of the circumstances, whether the identification is nevertheless "reliable enough to withstand a due process attack despite the suggestiveness of the pre-trial identification." *Robinson*, 146 S.W.3d at 516 (citations omitted). The factors which the court must consider are: "(1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the time between the crime and the confrontation." *Id*. at 517.

Concerning this issue, the trial court in this case held:

I think the issue is what was said before he picked out the man. He could have just as well not told him that after that, but I don't think that that taints the

-10-

identification procedure at all. The Detective, as far as up to the identification point has testified here that he did not tell the man it is number 5.

He did not tell the man anything other than he had [a] line-up that he wanted him to look at and at the time that he made the identification, you know, he picked out according to that that he is sure it is him and he is 100 percent sure and I think your motion to suppress the identification will have to be respectively overruled and denied.

We agree with the trial court that the line-up procedure was not unduly suggestive. Detective Brennan testified that he developed Defendant as a suspect from a fingerprint found on the victim's car. The victim had also given an officer the name of "Rell" or "Rail" as a possible nickname for his abductor. Detective Brennan then located a "mug shot" of Defendant, whose nickname was "Rell," from a police database and put together a photographic lineup composed of Defendant and five other similar-looking individuals.

Prior to showing the line-up to the victim, Detective Brennan gave instructions to the victim. He testified: "It [the instructions] tells them that the suspect may or may not be in the picture to look at the photographs and, you know, don't look at hair, look at facial features because they don't change, just as far as anything else." Detective Brennan then showed the line-up to the victim. He did not tell the victim that he had received a fingerprint match. He also did not indicate to the victim that the suspect was in the line-up. Detective Brennan testified that the victim identified Defendant as the person who abducted him. He said that the victim viewed the line-up "approximately 20 seconds and he made a 100 percent identification." It was then that Detective Brennan told the victim that the fingerprint matched that of Defendant and that he would be going to night court to obtain warrants on Defendant.

We acknowledge that the victim initially described his attacker at a black male who was 5'4" tall, weighing approximately 170 pounds, with black hair and long sideburns. However, the photographs in the line-up were of persons who were bald with goatees that appeared different from the description of the suspect provided by the victim. However, as pointed out by the State, this Court has held:

[A]ny discrepancy between [a victim's] initial description of the perpetrator and [a defendant's] appearance affects the weight of the evidence, not its admissibility. Indeed differences in [a defendant's] height and weight from the victim's description of the robber's height and weight should provide defense counsel with fertile grounds for cross-examination at trial . . . [S]uch

-11-

differences do not render the victim's pretrial identification of the [defendant] inadmissible.

*State v. Jeffrey Ray Jennings*, No. E1999-00848-CCA-R3-CD, 2000 WL 274078, at *3 (Tenn. Crim. App. March 14, 2000) *no perm. app. filed*. Furthermore, Detective Brennan instructed the victim to focus on the facial features of the subjects in the photographs rather than their hair. The victim was extensively questioned during cross-examination about the various discrepancies between the subjects in the photographs and his initial description of the suspect. Defendant is not entitled to relief on this issue.

### B. Prior Bad Act

Next, Defendant argues that the trial court erred in allowing Anissa Watkins to testify concerning an unrelated purse-snatching that was committed during the kidnapping in this case. More specifically, Defendant argues that the testimony should have been excluded under Tennessee Rule of Evidence 404(b). That rule provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:
>
> > (1) The court must upon request hold a hearing outside the jury's presence.
> >
> > (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
> >
> > (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
> >
> > (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b).

In Tennessee, evidence of other offenses may be admissible to show (1) motive; (2) intent; (3) guilty knowledge; (4) identity of the defendant; (5) absence of mistake or accident;

-12-

or (6) a common scheme or plan for commission of two or more crimes so related to each other that proof of one tends to establish the other. *Id*. If a trial court has substantially complied with the procedural requirements of the rule, this court will review the trial court's ruling for an abuse of discretion. *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997).

Prior to Defendant's first trial, he filed a motion in limine to "prevent the State from introducing in its case-in-chief any evidence of a separate theft from Ms. Anissa Watkins." At the hearing on Defendant's motion, Ms. Watkins testified that on March 31, 2008, at approximately 1:30 p.m., she stopped at a convenience store on the corner of 28th Avenue and D.B. Todd Boulevard because her tire was low. She entered the store to make sure that the air pump was working. As Ms. Watkins turned to exit the store, she saw "a black gentleman dipping his hand in my window and was kind of rambling through my things on the passenger side [ of the car]." Ms. Watkins told the man to get out of her car, and he took her purse, got back into a light blue Jaguar, and "sped out of there." She identified a picture of the victim's car as similar to the one that she had seen. Ms. Watkins testified that her purse contained medicine, her driver's license, insurance cards, jewelry, and some money. She was not familiar with the victim and there was no reason for her prescription bottle to be inside his car. Ms. Watkins estimated that there were three or four black males "maybe 25 to 30 in that age range" in the blue Jaguar. She further testified that the convenience store was in the same neighborhood as Paul's Market.

Ms. Watkins' testimony at Defendant's trial was substantially the same except that she thought there were only two people in the car. She did not recall previously testifying that were three or four people in the car, but she acknowledged that her memory would have been better at the time of her previous testimony. Also at trial, Ms. Watkins could not "pinpoint a time," but said that the theft occurred in the middle of the day before 2:00 p.m.

Concerning Defendant's motion, the trial court held:

I know she doesn't identify [Defendant]. I recognize that, but I think her testimony has some relevancy in showing that [the victim] was apparently not in control of his car.

It appears circumstantially that that probably is his car that these three or four young men were in and he wasn't in it. He is obviously not a young man and it would go to the fact that the car that was later recovered from [the victim] really had a pill bottle in it that came from Ms. Watkins and I think that there was never any implication at all that she had anything to do with this situation.

-13-

It is pretty obvious to the Court that she did not and that she was a victim herself at Mapco or wherever she was down the street from Paul's, so I think it is circumstantially evidence that is probative of Mr. - the defendant, [ ], being in this car when he finally let the man out and this comes from Ms. Watkins, in the same car, so I think it could be prejudicial effect to almost anything that you have, but it doesn't help the defendant, but I think the probative value here circumstantially that this car and the time frame to some extent has a bearing on my thoughts about it, within the possession of [Defendant] when he finally let [the victim] out of the car over there and from this pill bottle that belonged to Ms. Watkins being in the car, it came from the area near where the car was taken, so I would probably want to fashion some sort of jury instruction that would cover this to let the jury know that he is not on trial here for stealing this lady's purse.

He hasn't been identified, but only circumstantially it could be considered going to - to whatever it would be as an exception under 404(b) so I am going to allow her to testify about this.

I think it is enough of a nexus between what was found in his car, the defendant, and the whole situation that was all happened on the same day right in that same general area within a couple of blocks of each other, so I will let her testify and then if you have a proposed instruction you can have it or Alex you can work on something too.

It is kind of 404(b) but it is also kind of almost evidence of what was going on that day, so I don't think that it is just absolutely and only 404(b) type of things as Mr. Ben Ford is saying, but I do think that we need to have some sort of cautionary instruction about he is not on trial for stealing this purse or this prescription drug so if we can fit that in there some way, kind of look at that a little bit and if Ms. Yarbro has something that she wants to suggest or offer as a requested instruction I will be more than happy to consider it too, so I will leave that as that is now and then deal with that in the jury instructions, but I think that she will be able to testify, so, and I don't know whether I need to even give her a cautionary, whether I need to give any kind of cautionary instruction at the time of the testimony.

I could say something about it is not alleged here that this man was charged with stealing her purse or anything, but do you want me to go there or to just simply just let her testify and give some instruction in my written instructions? I mean he hasn't been identified as stealing the purse or the drugs?

The following exchange then took place between the trial court and defense counsel:

[Defense Counsel]: No.

THE COURT: I mean, he hasn't been identified as stealing the purse or the drugs.

[Defense Counsel]: Right. I, I don't think there is any need for a cautionary instruction to be in with her testimony - -

THE COURT: Okay.

[Defense Counsel]: - - but anything in the jury charge would work.

THE COURT: That is the way I looked at it too. So Alex be thinking about that, okay, then bring the jury on in.

At the conclusion of Defendant's trial, the trial court gave the following jury instruction concerning Ms. Watkins' testimony:

You have heard evidence in the form of the testimony of Anissa Watkins regarding an incident that she observed relating to the theft of her personal property. This testimony was provide - was provided as contextual background evidence - as contextual background evidence. However, the defendant is not charg[ed] of any crime that relates to this incident. You are to consider this evidence only as it provides a complete story of the events and not as evidence that the defendant would have a propensity or natural inclination to behave in a particular way.

If from the proof you find that the defendant has committed acts other than for that which he is on trial, you may not consider such evidence to prove his disposition to commit the offenses for which he is on trial. Such evidence of other acts, if considered by you for any purpose must not be considered for any purpose other than that specifically stated.

Defendant contends that the trial court erred in admitting Ms. Watkins' testimony as contextual background evidence, and the State concedes that the trial court erred by instructing the jury to consider the evidence as contextual background evidence. Evidence offered to show contextual background may be admissible, even if it involves evidence of a defendant's prior acts, in cases where the evidence is relevant to an issue other than

-15-

criminal propensity and its probative value is not outweighed by the danger of unfair prejudice. *State v. Gilliland*, 22 S.W.3d 266, 271 (Tenn. 2000). The standard by which a court determines relevance is set forth in Rule 401 of Tennessee's Rules of Evidence (evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable then it would be without the evidence"). Although this threshold for admitting evidence is "relatively lenient," background evidence used to show the context of events may not always pass even this low threshold of admission because it is rarely probative of an actual material issue at trial. *Id*. While the standard under which background evidence involving other crimes, wrongs, or acts will be admissible should be "narrowly drawn to avoid the negative implications associated with criminal propensity evidence, the standard should not be so narrow as to sacrifice the jury's understanding of the necessary context of the case." *Id*. at 272. Accordingly, our supreme court has held that, in cases where the state seeks to offer evidence of other crimes, wrongs, or acts that are relevant only to provide a contextual background, the state must first establish that (1) the absence of the evidence would create a chronological or conceptual void in its presentation of its case; (2) the void created by the lack of such evidence would likely result in significant jury confusion as to the material issues or evidence in the case; and (3) the probative value of the evidence is not outweighed by the danger of unfair prejudice. *Id*.

We find that the testimony by Ms. Watkins was properly admitted. The evidence was "somewhat" contextual background evidence. Officer Mace testified, without any objection on relevance grounds, that Ms. Watkins' prescription bottle was found in the victim's car. Ms. Watkins' testimony that she saw a young black male take her purse which contained her prescription bottle, and that he was in a light blue Jaguar similar to the victim's car, with one or more other young black males in it explains how the bottle got into the victim's car.

Ms. Watkins' testimony also corroborates the victim's testimony that he was not in the passenger compartment of his car mid-day on the day of the kidnapping. This is circumstantial evidence that he was, as he claimed, in the trunk of his car in the area where the kidnapping and robbery occurred several hours after his initial confrontation with Defendant.

Because this evidence corroborated the victim's testimony, it was highly probative and not outweighed by the danger of unfair prejudice. We conclude that the trial court did not err in admitting this evidence.

*C. Admission of Testimony Concerning Defendant's Nickname*

Third, Defendant contends that the trial court erred in admitting testimony concerning his nickname of "Rell." Prior to trial, Defendant filed a motion in limine asking the trial court to prevent the State from introducing evidence of his alleged nickname. More specifically, Defendant objected to testimony that the nickname was obtained from MySpace or a police database. He argued that the evidence was inadmissible hearsay under Tenn. R. Evid. 801 and 802, that the evidence in the police database was evidence that Defendant had committed other crimes excluded by Tenn. R. Evid. 404(b), and that the MySpace web page contained irrelevant, extraneous, and potentially prejudicial information.

The trial court held that that the State's witnesses would be allowed to testify that Defendant's nickname of "Rell" was obtained from a police database and a MySpace web page. The trial court cautioned the prosecution "to be very careful and not to be referring to this as something that came from mug shots or different police database[sic][,]" and instead "just say something just kind of generic that from some database or whatever it is without indicating that he has a prior record." Concerning the MySpace page, the trial court cautioned the prosecution to "be very careful" and omit any references on the MySpace page to Defendant having previously being incarcerated.

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). In general, hearsay statements are inadmissible. Tenn. R. Evid. 802 ("Hearsay is not admissible except as provided by these rules or otherwise by law."). "'The determination of whether a statement is hearsay and whether it is admissible through an exception to the hearsay rule is left to the sound discretion of the trial court.'" *State v. Thomas*, 158 S.W.3d 361, 400 (Tenn. 2005)(quoting *State v. Stout*, 46 S.W.3d 689, 697 (Tenn. 2001)). This Court will not disturb a trial court's ruling on the admission of hearsay evidence absent a clear showing that it abused its discretion. *Id*. More recently, in *Pylant v. State*, 263 S.W.3d 854 (Tenn. 2008), specifically discussing the admissibility of evidence when a hearsay objection has been made, the supreme court recognized,

> [Q]uestions concerning the admissibility of evidence rest within the sound discretion of the trial court, and this Court **will not interfere in the absence of abuse appearing on the face of the record**. *State v. Dotson*, 254 S.W.3d 378, 392 (Tenn. 2008); *see State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997); *State v. VanTran*, 864 S.W.2d 465, 477 (Tenn. 1993); *State v. Harris*, 839 S.W.2d 54, 73 (Tenn. 1992).

*Pylant*, 263 S.W.3d at 870 (*emphasis added*).

-17-

In a footnote in *Pylant*, the supreme court repudiated the opinion of this Court in *State v. Gilley*, 297 S.W.3d 739 (Tenn. Crim. App. 2008), that review of a hearsay ruling by the trial court must be reviewed under a de novo standard of review rather than an abuse of discretion standard. *Pylant*, 263 S.W.3d at 871 n.26. *Gilley* was filed on August 18, 2008, and *Pylant* was filed approximately five weeks later on September 25, 2008. After quoting this Court's reasoning in *Gilley*, the supreme court stated, "this Court continues to believe that questions concerning the admissibility of evidence are reviewed under an abuse of discretion standard." *Id.* Rule 4(G)(2) of the Rules of the Supreme Court of Tennessee states, "(2) Opinions reported in the official reporter . . . shall be considered controlling authority for all purposes unless and until such opinion is reversed or modified by a court of competent jurisdiction."

Concerning the standard of review on appeal on the issue of hearsay objections, there are contradictory holdings by the supreme court and the court of criminal appeals. Since the supreme court of Tennessee has appellate jurisdiction over the court of criminal appeals, it is obvious that the reported decision of the supreme court, especially when it rejects the opinion of the court of criminal appeals, must be followed.

### *MySpace Page*

Investigator Hugh Coleman testified that he determined Defendant had a MySpace account, and he subpoenaed the record for the account. He identified the subscriber report for the account which showed Defendant's name and the user number assigned to the account. Mr. Coleman found a message on Defendant's MySpace account that was sent using the name "Rell." He also identified a photograph of Defendant from the MySpace account.

The trial court properly found that information concerning Defendant's nickname obtained from his MySpace account was not inadmissable hearsay. We note, as pointed out by the State, that the hearsay rule does not exclude a party's own statement which is offered against that party. Tenn. R. Evid. 803(1.2)(A). "This means that any assertion a party spoke, wrote, or did may be used against that party as an admission." Neil P. Cohen et al., *Tennessee Law of Evidence* § 8.06[3][a](LEXIS publishing, 5th ed. 2005(footnotes omitted). The evidence established that Defendant had a MySpace page on which he posted pictures of himself and sent messages using the nickname of "Rell." Accordingly, Defendant is not entitled to relief on this issue.

### *Police Database*

At trial, Detective Christopher Brennan testified concerning Defendant's nickname as follows:

> I started the investigation by first calling [the victim] the night that I received the report, just to go over his side of the story and make sure it matched with what was on the report in the officer's report. The, that evening after I talked with him I went by the market to see if there was any surveillance video and they don't have any surveillance video there.
>
> Then two nights later I received an email from the latent print section saying that they had received a fingerprint hit on the fingerprints that the crime scene officer lifted from [the victim's] vehicle. I was able to run that name through our nickname database that is entered when people are arrested, if they have a nickname it goes in a database that we keep.
>
> The nickname that [the victim] had thought that he had heard the suspect called while he was in the trunk of the car matched the nickname that the defendant had used at that point in time, the nickname of Rell.
>
> At that point I put together a photo line-up and called [the victim] on the, I believe it was on the 7th and took that out and showed that to him where he positively identified the defendant as the person who committed the crime against him. At that point I took warrants out on the defendant.

The State concedes, and we agree that Detective Brennan's testimony referring to Defendant's nickname being on the database was hearsay, and there was no foundation for its admissibility under any exception to the hearsay rule. However, any error in admitting the testimony was harmless since Mr. Coleman and Everett Brewer, whose testimony was properly admitted, both testified that Defendant's nickname was "Rell."

Defendant also complains that Detective Brennan's testimony was inadmissible evidence that he had committed another crime or bad act independent from that for which he was charged under Tenn. R. Evid. 404(b). As previously noted, Defendant included this ground in his motion in limine, and the trial court warned the State not to refer to Defendant's nickname as coming from a police database. However, the State violated the trial court's instruction when Detective Brennan testified that, "I was able to run that name through our nickname database that is entered when people are arrested, if they have a nickname it goes in a database that we keep." Although Detective Brennan's testimony concerning the arrest was improper, Defendant did not request a mistrial or a curative instruction or object to the testimony concerning the arrest. The rules do not require "relief

[to] be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." Tenn. R. App. P. 36(a). Therefore, the issue is waived on appeal.

*D. Length of Sentence*

Finally, Defendant argues that his sentence of twenty-five years at one-hundred percent for his especially aggravated kidnapping conviction is excessive. Previously, our review of a defendant's challenge to the length, range, or manner of service of a sentence was de novo with a presumption of correctness. However, our supreme court recently adopted a new standard of review for sentencing in light of the 2005 changes in Tennessee sentencing law. *State v. Bise,* 380 S.W.3d 682 (Tenn. 2012). In *Bise,* the Court concluded:

> In summary, the 2005 amendments to the 1989 Act were intended to bring our sentencing scheme in line with the decisions of the United States Supreme Court in this area. Accordingly, when the 2005 amendments vested the trial court with broad discretionary authority in the imposition of sentences, de novo appellate review and the "presumption of correctness" ceased to be relevant. Instead, sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a "presumption of reasonableness."

*Id.* at 708. Accordingly, we now review a defendant's challenge to the sentence imposed by the trial court under an abuse of discretion standard with a "presumption of reasonableness." *Id.*

Tennessee's Sentencing Act provides:

(c) The court shall impose a sentence within the range of punishment, determined by whether the defendant is a mitigated, standard, persistent, career, or repeat violent offender. In imposing a specific sentence within the range of punishment, the court shall consider, *but is not bound by,* the following advisory sentencing guidelines:

(1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

(2) The sentence length within the range should be adjusted, as appropriate by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

T.C.A. § 40-35-210(c)(1)-(2) (emphasis added).

In conducting a review of a sentence, this Court must consider (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (f) any statistical information provided by the Administrative Office of the Courts as to Tennessee sentencing practices for similar offenses; and (g) any statement the defendant wishes to make in the defendant's own behalf about sentencing. T.C.A. § 40-35-210(b); *see also State v. Carter*, 254 S.W.3d 335, 343; *State v. Imfeld*, 70 S.W.3d 698, 704 (Tenn. 2002).

A trial court is mandated by the Sentencing Act to "impose a sentence within the range of punishment." T.C.A. § 40-35-210(c). A trial court, however, "is no longer required to begin with a presumptive sentence subject to increase and decrease on the basis of enhancement and mitigating factors." *Carter*, 254 S.W.3d at 346. Therefore, an appellate court is "bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." *Id.*

A trial court's "fail[ure] to appropriately adjust" a sentence in light of applicable, but merely advisory, mitigating or enhancement factors, is no longer an appropriate issue for appellate review. *Id.*, 254 S.W.3d at 345 (citing *State v. Banks,* No. W2005-02213-CCA-R3-DD, 2007 WL 1966039, at *48 (Tenn. Crim. App. July 6, 2007) (noting that "[t]he 2005 amendment [to the Sentencing Act] deleted appellate review of the weighing of the enhancement and mitigating factors, as it rendered the enhancement and mitigating factors merely advisory, not binding, on the trial courts"). In *Bise* the Court concluded:

We hold, therefore, that a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005. So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed by the trial court within the appropriate range should be upheld.

*Bise*, 380 S.W.3d at 706.

Although he was convicted of aggravated robbery and especially aggravated kidnapping, Defendant only challenges his sentence for especially aggravated kidnapping, a Class A felony, with a sentencing range of fifteen to twenty-five years as a Range I offender. T.C.A. §§ 39-13-305(b)(1); 40-35-112 (a)(1). The trial court applied the following enhancement factors: the Defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range; the Defendant, before trial has failed to comply with conditions of a sentencing involving release into the community; and the victim was particularly vulnerable due to physical disability. Tenn. Code Ann. § 40-35-114 (1), (4), and (8). The trial court also applied one mitigating factor: that the Defendant voluntarily released the victim alive. Tenn. Code Ann. § 39-13-305(b)(2).

Defendant argues that the trial court erred in applying enhancement factor(4), that the victim was particularly vulnerable due to physical disability. However, we conclude that this precise argument is no longer proper grounds for appeal under our Supreme Court's decision in *Bise*. As previously discussed, the Court in *Bise* held that even if a trial court misapplies an enhancement or mitigating factor, the sentence is not invalidated unless the trial court "wholly departed from the 1989 Act, as amended in 2005." *Bise*, 380 S.W.3d at 706. In this case, the trial court sentenced Defendant to twenty-five years for especially aggravated kidnapping, a sentence consistent with the purposes and principles of sentencing and within the appropriate range.

The record clearly shows that the trial court stated with specificity its reasons for imposing the maximum sentence. The record also shows that the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration to the principles that are relevant to sentencing. In fact, as pointed out by the State, the trial court considered but declined to impose consecutive sentences in this case, noting that "the increased length of punishment within the Defendant's range was a consideration for not imposing consecutive sentencing." The court further stated that the twenty-five year sentence "is the minimum sentence necessary to protect society and is the least severe measure necessary to appropriately punish the defendant." Based on our review, we conclude that the trial court did not abuse its discretion by imposing a sentence of twenty-five years for Defendant's especially aggravated kidnapping conviction.

## CONCLUSION

After a thorough review, we affirm the judgments of the trial court.

_____
THOMAS T. WOODALL, JUDGE